JAMES SHAUGHNESSY, Plaintiff-Appellant, v. SKENDER CONSTRUCTION COMPANY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—01—4356

Opinion filed July 21, 2003.

Mark Novak and Andrew M. DeLuca, both of Anesi, Ozmon, Rodin, Novak & Kohen, Ltd., of Chicago, for appellant.

D. Patterson Gloor, Donald F. Ivansek, and Brian A. Schroeder, all of Cassiday, Schade & Gloor, of Chicago, for appellee Skender Construction Company.

Michael J. Higgins, of Law Offices of David A. Isso & Associates, of Chicago, for appellee Garbe Iron Works, Inc.

JUSTICE SMITH delivered the opinion of the court:

Plaintiff James Shaughnessy appeals orders granting summary judgment for defendants Skender Construction Company (Skender) and Garbe Iron Works, Inc. (Garbe). Plaintiff argues that the trial court erred in granting summary judgment because section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)) and "direct negligence" established a duty of care in this case. We disagree and affirm the summary judgment orders of the trial court.

This litigation arose after plaintiff was injured while working at a construction site at the Oak Brook Racquet Club. The racquet club hired Skender as the general contractor for renovations, and Skender subcontracted with Garbe for the fabrication and erection of a structural steel and metal deck. Garbe then subcontracted with F.K. Ketler Company (Ketler)[1] for the erection of the steel. Ketler, an independent contractor, employed plaintiff as an ironworker. On October 30, 1997, plaintiff placed a wooden board over a gap and tried to use the board as a bridge, but the board broke. Plaintiff fell several feet to the basement floor of the racquet club and was injured.

Plaintiff filed an amended complaint alleging negligence against defendants.[2] Defendants Skender and Garbe filed motions for summary judgment, arguing that they lacked a duty to plaintiff because they did not retain sufficient control over Ketler's work. The record before the trial court included the parties' contracts and subcontracts.

The contract between the racquet club and Skender was a standard form agreement approved by the Associated General Contractors of America. The contract provided that Skender would supervise and direct the work and be responsible for and control the construction means, methods, techniques, sequences and procedures for coordinating all portions of the work, unless the contract provided otherwise. Skender also agreed to be responsible for initiating, maintaining and supervising all safety precautions and programs in

---

[1]Ketler was a third-party defendant in this litigation but is not a party to this appeal.

[2]Robinette Demolition, Inc., was also named as a defendant, but is not a party to this appeal.

connection with the performance of the contract and to employ a superintendent whose duties included the prevention of accidents.

The subcontract between Skender and Garbe indicates that the scope of Garbe's work was to furnish all labor, equipment, material and supervision necessary to install the structural steel and metal deck. The subcontract between Garbe and Ketler indicates that the scope of Ketler's work was to furnish all labor, equipment and supervision to unload and erect at the jobsite the structural steel and metal deck.

Discovery depositions of several witnesses revealed the following information.

William Guinea, a Skender project manager, testified that he served as a liaison between Skender and the architects, owners and various subcontractors. Guinea spent about 75% of his time in the office and visited Skender's smaller projects, like the racquet club construction site, either weekly or biweekly. Skender employed Larry Williams, a superintendent assigned to the racquet club project, to schedule and coordinate the trades on the site and ensure that the project was built to plans, on time and within budget. Superintendent Williams was at the site on a daily basis. Guinea had no personal dealings with anyone from Ketler.

Guinea acknowledged that, contractually, superintendent Williams had the authority to stop the work if he detected unsafe practices or conditions, but Skender did not employ a safety person for the project. Guinea also acknowledged that, pursuant to the contract between Skender and Garbe, Skender had discretionary authority to provide equipment to a subcontractor if requested, but Guinea had no knowledge that Skender provided any equipment to any subcontractor at the racquet club project.

Guinea explained that the racquet club remained open to patrons during the renovation project, but construction workers were told to use a separate service entrance on the east side of the building to access the work area in the basement of the club. The east entrance led to an interior stairwell that led to the basement. However, because it was not feasible to move structural steel into the basement through that east entrance, an opening was cut into the south wall of the building at grade level. Guinea testified that the means and methods of moving the structural steel into the basement were not in the plans and specifications of the project but, rather, were the "responsibility" of "Skender and their subcontractors." Guinea did not know how any equipment was moved in or out of the south wall opening.

Alfredo Vasquez, a Skender laborer, testified that the dual purpose of the south wall opening was to let light in and to bring large mate-

rial and equipment into the work area. Vasquez's duties included opening the south wall in the morning and then closing it at the end of the work day. Vasquez secured the opening by nailing a plywood board over it and placing barricades with caution tape in front of the plywood. The day before the incident, Vasquez placed a ladder in the basement and used it to remove dirt from the work area. According to Vasquez, Skender superintendent Williams was not at the project site prior to plaintiff's fall.

Gerald Erskine testified that he was employed by Ketler for 10 years and, as a foreman, was responsible for instructing Ketler employees on their duties and overseeing the placement of materials and equipment. Erskine was the foreman of Ketler's four-person crew at the racquet club project, and plaintiff was injured on Ketler's first day at that site. Prior to arriving at the site, Erskine's Ketler supervisor told him to use the south wall opening to bring the steel into the basement.

Erskine testified that when he arrived at the site, Skender superintendent Williams showed him where to store steel after it was unloaded from a truck and which areas of the parking lot not to block. Superintendent Williams also told Erskine that all construction workers must use the east entrance to access the stairway to the basement. Thereafter, Erskine instructed his crew to use that east entrance and told them to unload the truck and where to store the steel. Meanwhile, Erskine went inside the basement and determined where to hang his rigging, which included lifting devices and needed to be moved into the basement before the steel was brought in. Shoring towers were in place inside the basement to support the ceiling. Erskine also inspected the south wall opening and the work area.

Erskine testified that he instructed his crew to use a rope to lower their rigging into the basement through the south wall opening. Skender did not direct Ketler to move its rigging through the south wall opening. While plaintiff and Ketler crew member Robert Petrouski brought the rigging to the wall opening, Erskine and two other crew members used the east entrance and proceeded to the basement. As Erskine entered the basement work area, he saw the end of plaintiff's fall.

Erskine testified that he learned after plaintiff's fall that plaintiff wanted to untie the rigging that he and Petrouski had lowered into the basement. To reach the basement, plaintiff planned to climb down a basement shoring tower located about five feet from the south wall opening. To reach the tower, plaintiff placed a board to span the gap between the tower and the ledge of the wall opening. The board, however, broke in two pieces and appeared to be rotten inside. Erskine

testified that plaintiff's use of the board was an unsafe practice and plaintiff could have instead used the east entrance stairway or the extension ladder on Erskine's Ketler truck. Moreover, plaintiff did not have to access the basement because Erskine and the two other crew members intended to assist plaintiff and untie the rigging once they got inside the basement.

Plaintiff testified that he worked for Ketler as an ironworker for a few months before the October 30, 1997, incident. When plaintiff arrived at the project, a Skender employee told him to park his vehicle on the street rather than in the parking lot. Plaintiff received all his work orders from Erskine and never spoke with Skender superintendent Williams. Plaintiff provided his own hand tools, and Ketler provided the rigging.

Plaintiff testified consistently with Erskine regarding the unloading of the steel and the lowering of the rigging into the basement. Plaintiff added that he picked up from the ground an eight-foot-long four-by-four board, which was used on the truck that delivered the steel. Plaintiff slapped the board against a beam to see if it was sound and did not hear any cracks. No one told plaintiff to use the board, and only his coworker Petrouski was in the area when plaintiff placed the board to span the gap. Moreover, plaintiff did not tell anyone from Skender that he was using the board in that manner.

Plaintiff testified that he took two steps on the board and was only on it for a "fraction of a second" before it broke. Plaintiff thought only his coworker Petrouski saw him fall. Plaintiff acknowledged that Ketler would have supplied any ladder plaintiff needed, as Ketler had done in the past. Plaintiff, however, stated that he did not see a ladder in the immediate area and Erskine had gone somewhere else.

Robert Petrouski, a Ketler crew member, testified generally consistently with plaintiff and Erskine. Petrouski, however, stated that he learned of the existence of the east entrance about one week after plaintiff's fall. Petrouski added that he looked for a ladder prior to the incident, but Erskine's truck was not in the area. According to Petrouski, he looked about a 15-yard radius from the work area and saw the Skender superintendent in the parking lot. When Petrouski asked the superintendent whether a ladder was available to get in the basement, the superintendent responded "no" and told Petrouski to "just get the job done." When Petrouski returned to the work area, plaintiff had already placed the board and stepped on it. Only plaintiff, Petrouski and a crane operator were in the area when plaintiff fell. Petrouski confirmed that no one from Skender provided him with any equipment or told him how to perform his job.

Allen Malinowski, a Ketler crew member, was present when

Skender superintendent Williams showed Erskine where to store the steel. Although Williams indicated that the steel would be brought in through the south wall opening, that information was obvious because the steel was too large to use any other opening. Malinowski testified that after Erskine told plaintiff and Petrouski to lower the rigging, Erskine, Malinowski and another crew member left the area "to get some other material or whatever." According to Malinowski, the crew knew that the day's work entailed getting the steel into the building, and although "[t]here [were] no real directives at that point," there was a "lot of assumption."

Peter Mitacek, a foreman of subcontractor Robinette Demolition, Inc., testified that he was not present when the Ketler crew was at the jobsite. Although Skender was involved in scheduling and checking the progress of the work and could stop work that did not conform with plans, Skender did not tell Robinette Demolition, Inc., how to actually do its job. Rather, Mitacek as foreman "would run the job."

■ The circuit court granted summary judgment in favor of defendants, and plaintiff appealed. The purpose of summary judgment is not to try a question of fact, but to determine whether one exists. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 517 (1993). Summary judgment is appropriate only where the pleadings, depositions, admissions and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1996); *Vickers v. Abbott Laboratories*, 308 Ill. App. 3d 393, 399 (1999). However, where material facts are disputed, the trial court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the facts presented in favor of the nonmovant. *In re Estate of Hoover*, 155 Ill. 2d 402, 410-11 (1993). While the summary judgment procedure should be encouraged as an aid in the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). We review a grant of summary judgment *de novo. Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995).

On appeal, plaintiff contends that defendants' conduct and the contract terms establish that defendants retained sufficient control over the work to give rise to a duty to plaintiff under section 414 of the Restatement (Second) of Torts.

■ As a general rule, one who employs an independent contractor is not liable for the acts or omissions of the latter. *Rangel v. Brookhaven Constuctors, Inc.*, 307 Ill. App. 3d 835, 838 (1999). A recognized exception to this rule is articulated in section 414 of the

Restatement (Second) of Torts. Under this exception, one who employs an independent contractor but retains control of any part of the work is subject to liability for physical harm to others that is caused by the employer's failure to exercise his control with reasonable care. Restatement (Second) of Torts § 414 (1965).

Prior to 1994 in Illinois, negligence liability in the context of construction-related injuries was analyzed under the terms of the Structural Work Act (740 ILCS 150/1 *et seq.* (West 1994)), which coexisted with common law negligence principles, as expressed in section 414. *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1057 (2000). In 1994, however, the Structural Work Act was repealed and survived by the common law negligence principles found in section 414. Pub. Act 89—2, § 5, eff. February 14, 1995; *Bokodi*, 312 Ill. App. 3d at 1057-58. Section 414 states:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

Comment *c* to section 414 explains the "retained control exception":

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, Comment *c*, at 388 (1965).

■ To state a claim for negligence under section 414, the plaintiff must allege that the defendant owed him a duty and breached that duty, and that plaintiff's injury was proximately caused by the breach. *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583, 587 (2002). Whether a duty exists is a question of law and, under section 414, turns on whether the defendant controlled the work in such a manner that he should be held liable. *Kotecki*, 333 Ill. App. 3d at 587. Because plaintiff fails to raise a fact question on whether Skender or Garbe exerted sufficient control over Ketler to be held liable, the trial court properly determined that no material facts were at issue and properly awarded summary judgment to defendants.

The evidence does not indicate that Skender or Garbe controlled the manner by which plaintiff completed his work assignment. Specifically, Ketler foreman Erskine stated that Ketler furnished its own rigging and equipment for the project and that a ladder was always available on Ketler's truck. Moreover, before his crew commenced work, Erskine inspected the work area, determined where to hang his rigging and informed his crew that workers had to use the east service entrance. Erskine, not Skender, instructed the Ketler crew to lower the rigging into the basement through the south wall. In addition, Erskine never expected plaintiff to untie the rigging in the basement, because Erskine and the other crew members undertook that task.

Plaintiff admitted in his deposition that, aside from his own hand tools, Ketler supplied all the equipment and that Erskine gave plaintiff and his coworkers their assignments. According to plaintiff, the only information he received from a Skender laborer was that plaintiff could not park his vehicle in the racquet club parking lot. Plaintiff also conceded that no Skender or Garbe employee saw plaintiff place the board over the gap and attempt to use the board as a bridge. Plaintiff said that he never spoke to any Skender or Garbe representative and that no one from there told him how to perform his work. Furthermore, Skender superintendent Williams' statement to Petrouski to "just get the job done" hardly indicates that Skender retained control over plaintiff's work.

Plaintiff's argument that Skender, Garbe and Ketler's contractual relationship created an issue of control is unpersuasive in light of the deposition testimony. The excerpts of the contracts on which plaintiff relies establish only that Skender and Garbe reserved a general right to stop, start and inspect the progress of the work. See *Kotecki*, 333 Ill. App. 3d at 588 (no duty to plaintiff established based on general contractor's reservation in contract of general right to supervision, which did not refer to a right to direct the specific work of the independent contractor); *Rangel*, 307 Ill. App. 3d at 838-39 (same). The undisputed facts establish, however, that Ketler was free to perform the work in its own way and only Ketler exercised control of plaintiff's work. Plaintiff fails to establish that Skender and Garbe retained an amount of supervision such that plaintiff, an ironworker employed by a subcontractor, was not free to complete the work either in his own way or according to his employer's instructions.

Plaintiff's reliance on *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051 (2000), and *Brooks v. Midwest Grain Products of Illinois, Inc.*, 311 Ill. App. 3d 871 (2000), for an opposite conclusion is misplaced. In *Bokodi*, this court held that the general contractor defendants' active control, supervision and constant monitoring raised

an issue of fact regarding whether defendants should have been aware of the unsafe lifting method that led to the plaintiff's injury. *Bokodi*, 312 Ill. App. 3d at 1063. Specifically, the defendants undertook extensive efforts to control safety standards and employed a full-time safety manager "whose sole function was to seek out safety hazards." *Bokodi*, 312 Ill. App. 3d at 1062. The safety manager inspected the work site and enforced safety regulations by instructing workers to put on hard hats, harnesses or lanyards. *Bokodi*, 312 Ill. App. 3d at 1054. Moreover, any employee of the general contractor had the authority to stop the work of any subcontractor if safety violations were witnessed. *Bokodi*, 312 Ill. App. 3d at 1054.

Plaintiff Bokodi, an employee of a subcontractor, and his foreman were using a manual pulley to lift metal sheets. *Bokodi*, 312 Ill. App. 3d at 1054. The foreman's position on the ground, however, made it difficult for him to assist the plaintiff, who was above ground in a "manlift." *Bokodi*, 312 Ill. App. 3d at 1054. The foreman instructed the plaintiff to alter the pulley, which forced plaintiff to change his position in the "manlift." *Bokodi*, 312 Ill. App. 3d at 1054-55. After lifting and installing a few more sheets, plaintiff injured his back. *Bokodi*, 312 Ill. App. 3d at 1055. Notably, when the plaintiff began work at the project a week before his injury, he saw electric lifting equipment at the site and asked his foreman and a union steward if he could use that equipment. *Bokodi*, 312 Ill. App. 3d at 1055.

Similarly, in *Brooks*, the record indicated that material facts were at issue regarding whether the general contractor defendant retained sufficient control over the burn and welding work performed by plaintiff, an employee of an independent contractor. 311 Ill. App. 3d at 874. Specifically, the defendant required a permit before burn work could begin, and defendant's project engineer was present at the time of the accident to answer a question about how the work was to be performed. *Brooks*, 311 Ill. App. 3d at 874. Moreover, the defendant's project engineer clearly observed plaintiff working on a suspended platform without a safety harness. *Brooks*, 311 Ill. App. 3d at 875. The court stated that it was reasonable to infer that the plaintiff could not proceed with his duties until he received confirmation from the defendant's project engineer that the plaintiff was performing the work correctly. *Brooks*, 311 Ill. App. 3d at 874-75.

Here, neither Skender nor Garbe undertook anything resembling either the pervasive supervision and monitoring seen in *Bokodi* or the control seen in *Brooks*. Moreover, no one from Skender or Garbe saw plaintiff engage in the unsafe practice that led to his injury or even had notice that plaintiff intended to engage in such conduct. Plaintiff, who was injured on his first day at the jobsite, admitted that

he was only on the board for a "fraction of a second" before the board broke and that only his coworker was in the area.

We believe this case is more like *Rangel*, 307 Ill. App. 3d at 837, where the plaintiff was an employee of a drywall subcontractor, who told plaintiff to step on braces extending from a scaffold to position drywall into place. The plaintiff was injured when he fell after a brace he stepped on gave way. *Rangel*, 307 Ill. App. 3d at 837. This court found that the subcontractor provided all supplies and directions to its employees; plaintiff was injured when he followed the subcontractor's instructions for performing the work; there was no evidence that the general contractor was aware that the work was being done in an unsafe manner before the plaintiff was injured; and the general contractor's general reservation of the right of supervision did not translate into the control over details of the subcontractor's work necessary to expose the general contractor to liability. *Rangel*, 307 Ill. App. 3d at 839. Similarly, the evidence here established that Ketler was entirely free to perform the work in its own way where Ketler's foreman decided to move Ketler's rigging into the basement through the south wall opening and gave plaintiff all his work instructions. Moreover, there was no evidence that Skender or Garbe knew or had notice of the hazardous method plaintiff employed to descend into the basement. See also *Kotecki*, 333 Ill. App. 3d at 588-89.

We reject plaintiff's contention that *Rangel*[3] was an "aberration" and was "addressed" by *Bokodi* and *Brooks*. Neither *Bokodi* nor *Brooks* criticized *Rangel*. Rather, *Bokodi* distinguished *Rangel* on its facts (*Bokodi*, 312 Ill. App. 3d at 1061-63), and *Brooks*, which never discussed *Rangel*, distinguished another case (*Brooks*, 311 Ill. App. 3d at 875). Because the evidence here fails to indicate sufficient control by defendants over Ketler's or plaintiff's work, plaintiff fails to raise an issue that defendants owed a duty to plaintiff under the retained control exception of section 414. Accordingly, plaintiff fails to raise a factual question necessary to survive summary judgment.

■ Next, plaintiff contends that defendants are liable for "direct negligence," alleging, *inter alia*, that Garbe provided the defective wood which plaintiff walked on and that Skender directed Ketler to move material and equipment through the wall opening but failed to provide a ladder and failed to inform plaintiff of an alternate access to

---

[3]Although plaintiff's brief included *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916 (1994), in its aberration argument, we need not address *Fris*, where the procedural posture did not involve summary judgment but rather whether the trial court erred in denying defendant's motion for judgment *non obstante verdicto*. 255 Ill. App. 3d at 925.

the basement. Plaintiff's "direct negligence" arguments, however, lack merit. As discussed above, construction-related common law negligence liability of general contractors for employees of independent contractors is analyzed under section 414 of the Restatement (Second) of Torts. Plaintiff cites no relevant authority to support his arguments concerning "direct negligence."

The judgment of the circuit court is affirmed.

Affirmed.

GORDON, P.J., and O'MALLEY, J., concur.