SIXTH DIVISION

February 27, 2004

No. 1-02-1557

JOHN MARTENS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

) Nos. 01 L 1467

)        98 L 8631

MCL CONSTRUCTION CORPORATION, )

and SHELCO STEEL WORKS, INC., ) Honorable

) David G. Lichtenstein,

Defendants-Appellees. ) Judge Presiding.

)

JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff John Martens appeals the trial court's order granting summary judgment for defendants MCL Construction Corporation (MCL) and Shelco Steel Works, Inc. (Shelco).  Based on the dismissal of all plaintiff's claims, the trial court deemed moot Shelco's motions for partial summary judgment, and to strike and dismiss plaintiff's strict products liability claim.  Plaintiff argues the trial court erred in granting MCL and Shelco summary judgment, contending there was a genuine issue of material fact regarding whether those defendants owed plaintiff, an employee of an independent contractor, a duty of care pursuant to section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts §414 (1965)).  Plaintiff also seeks reinstatement of his strict products liability claim against Shelco.  We affirm the judgment of the trial court.

BACKGROUND

The following facts are taken from the pleadings, depositions and affidavits.  Plaintiff filed an amended complaint alleging (count I) defendants breached their duty to provide plaintiff a safe place to work by failing to provide fall protection.  Plaintiff also alleged (count II) a strict products liability claim against Shelco, contending Shelco fabricated an unreasonably dangerous steel beam by adding stiffeners and failing to mark the beams to warn users of the presence of the stiffeners.

Plaintiff was an ironworker employed by F.K. Ketler Company (Ketler), an independent contractor, which was hired as part of a project to construct condominiums and single-family homes.  MCL was the construction manager and hired Shelco to fabricate and erect steel for a multistory building.  Shelco subcontracted Ketler to perform the actual steel erection work.  On July 10, 1997, plaintiff fell from a steel beam and sustained injuries.

MCL president Dan McLean testified that MCL did not perform any construction work but, rather, hired qualified, union-licensed contractors who were in charge of how they performed their own work.  MCL supervised only its own work–not the work of the subcontractors.  The purpose of the contract between the owner and MCL was to satisfy the requirements of a lender, and the contract primarily addressed overhead costs MCL received from the owners.  The contract between the owner and MCL consisted of multiple documents, including a 14-page agreement, a 24-page 14-article general conditions document, and the drawings, specifications and addenda.

Only a few provisions of the general conditions document between the owner and MCL are relevant to the matters raised on appeal.  Specifically, MCL was responsible for and had control "over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless Contract Documents give other specific instructions concerning these matters."  MCL required subcontractors to be bound by the terms of the contract documents and to assume toward MCL all the obligations and responsibilities MCL assumed toward the owner and architect.  MCL was "responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract."  Regarding safety, MCL would give notices and comply with applicable laws, ordinances, rules and regulations bearing on the safety of persons or property or their protection from damage, injury or loss; erect and maintain, as required by existing conditions and performance of the contract, reasonable safeguards for safety and protection; and designate a member of MCL at the site whose duty was to prevent accidents.

According to the contract between MCL and Shelco, Shelco was responsible for providing materials, equipment and labor with proper supervision of the steel fabrication and erection.  Shelco warranted that it was familiar with and in compliance with all applicable laws, regulations and rulings, including Occupational Safety and Health Administration (OSHA) and workers' compensation.  Shelco agreed to abide by MCL's directives, policies and procedures, including safety procedures.  Shelco excluded from the contract responsibility for OSHA safety cables at the perimeter of mechanical openings in the floors and roofs and for maintaining such safety cables.

 According to the subcontract between Shelco and Ketler, Ketler was responsible for furnishing
 the required field labor and facilities to unload and erect the structural steel in accord with the architect's plans and specifications.  Ketler was also responsible for OSHA safety cables at the floors and roofs.  All applicable OSHA requirements were part of the subcontract, and the American Institute of Steel Construction (AISC) Code of Standard Practice applied except where overridden by project plans or specifications.  The AISC, an association that sets forth guidelines for steel erection, is recognized in the industry as authoritative.  According to the AISC Code, the fabricator was not responsible for erection safety if the structure was erected by others.

Ketler furnished a safety manual to MCL in accordance with the safety plan as part of the contract between MCL and Shelco.  Ketler's safety manual provided that those "working aloft on skeleton steel shall tie off their safety lines except when moving from one point to another."  Ketler's safety manual also provided that the foreman has the greatest burden of responsibility for putting the safety rules into practice.

Plaintiff had been an ironworker since 1975 and had been on the job in question for about two months before he fell.  He exclusively took his directions from Ketler foremen Bill Gaynor and John Kirincich.  On the morning he fell, plaintiff was teamed up with Kirincich to land, position and connect steel bar joists to steel beams to form the decking between the ceilings and floors.  They were at the top of the erected structural steel, which was the seventh floor, and decking was in place on the fifth floor.  Plaintiff had attached a safety line or lanyard to his personal tool belt but was not tied off because he had to move freely as part of the job.  Plaintiff was working in an interior bay of beams as opposed to the perimeter of the structural steel.

Penetrations in the webs of steel beams were common at a jobsite and allowed other trades to install utilities and ductwork through the penetrations.  Because penetrations compromised the strength of a beam, pieces of steel called stiffeners were welded around the penetrations for reinforcement.  Stiffeners surrounded the penetrations like a box and protruded about four inches beyond each side of the beam web and about one inch beyond each side of the beam flanges.  Shelco shipped the beams to the jobsite with the penetrations and stiffeners prefabricated.  There were no regulations or industry standards concerning marking the beams to indicate the presence of penetrations or stiffeners.  Plaintiff knew penetrations and stiffeners were prevalent on beams throughout the job.

Plaintiff was standing on a beam that was bolted to columns and part of the structural skeleton of the building.  As he waited for the next load of bar joists, he attempted to sit down and straddle the beam.  However, when he lowered one foot onto the lower flange of the beam, his foot apparently hit a stiffener, which allegedly caused him to lose his balance.  Plaintiff fell onto a beam on the sixth floor and then slid down a column to the fifth floor.

Ketler foreman Bill Gaynor testified he was in charge of all Ketler's operations on site, gave all the orders to the Ketler crew and was in charge of all the means and methods used.  Gaynor did not consult with anyone from MCL or Shelco regarding the operative details of Ketler's work.  Gaynor determined when a Ketler crew member needed to tie off.  Ketler had no tie-off requirement of its own; it simply followed the OSHA and union rules regarding ironworkers tying off at heights more than 2 floors or 25 feet above a deck.  On the day plaintiff fell, Gaynor directly supervised the raising crew while Kirincich supervised the decking crew.  Because plaintiff was working 2 floors and less than 25 feet above the fifth-floor decking, there was neither a requirement nor a need for him to tie off.  In Gaynor's 20 years in the iron-erecting business, he never saw beams marked to indicate the presence of stiffeners, and it was not industry custom and practice to make such marks.

Ketler foreman John Kirincich was an ironworker for 17 years and testified consistently with Gaynor regarding Ketler's supervision of its crew.  Kirincich added that he and plaintiff never tied off while working in an interior bay because it was not necessary and they were not higher than 2 floors or 25 feet above a deck.  Kirincich explained that ironworkers use the lanyard on their tool belts to tie off at various points, like the perimeter cable.  Here, however, plaintiff and Kirincich were doing interior joist work, and it would have been unsafe to tie the lanyard under a beam because they would not have enough time to move out of the way of a swinging beam or to respond if something failed.  In addition, it was possible on that job to look down and see a stiffener prior to stepping down onto the lower flange of a beam.

Ketler employee and union steward John Hoyne testified that Ketler foreman Gaynor gave the crew daily directions.  When plaintiff fell, Hoyne was on the ground working with the crane under Gaynor's direction.  Hoyne assisted in taking plaintiff to the ground after he fell.  There was decking on the fifth floor immediately below where plaintiff fell, and any openings in the deck, such as stairwells or elevator shafts, were more than 10 feet away.

MCL safety director Leon Williams testified that OSHA regulations distinguished between ironworkers and other trades, requiring fall protection at a six-foot height for most trades except ironworkers and a few other trades.  Ironworkers did not need to tie off while working on the interior of the building if they were no higher than 2 floors or 25 feet above decking.  MCL's safety manual incorporated the OSHA 2-floor/25-foot standard for ironworkers.  Plaintiff was only 2 floors and less than 25 feet above the fifth floor decking.

Williams acknowledged that MCL's safety manual, in a section titled "Fall Protection: General," provided that if fall protection was deemed necessary, the subcontractor must develop a fall protection program and submit it to MCL for approval.  At a minimum, workers must be protected from falls greater than six feet.  However, a separate section of that manual, titled "Fall Protection and Steel Erection," incorporated the OSHA 2-floor/25-foot standard for ironworkers.  Williams explained that MCL wrote the 6-foot tie-off rule before it held any meetings with ironworkers, who insisted on following the OSHA 2-floor/25-foot standard because MCL's 6-foot rule was not feasible.  Before steel erection work began, a Shelco representative said the six-foot rule was not feasible for structural steel erection, and Ketler foreman Gaynor said the ironworkers could not tie off at six feet 100% of the time.  Accordingly, the parties agreed that the six-foot rule would apply to ironworkers when it was feasible, which would be determined by the subcontractors.

Williams testified that Ketler was in charge of the means, methods and operative detail of erecting the steel.  Williams visited the jobsite about twice a week and addressed safety observations at meetings or to a foreman.  If Williams saw an unsafe condition or act at the jobsite, he wrote a citation and notified the foreman of the crew.  For example, MCL sent Ketler and Shelco two safety warnings regarding a problem with the manner in which Ketler attached its perimeter safety cables.  If the crew continued working in an unsafe manner, Williams would report the matter to the MCL project manager.

Williams could make safety recommendations to Ketler foremen but could not demand that ironworkers comply with a safety standard that was greater than the OSHA requirement.  Williams showed Gaynor photographs of Ketler ironworkers working in compliance with the OSHA standard and recommended the ironworkers use retractable lanyards and a center line to tie off.  Gaynor responded that the recommendation was not feasible on this project because the ironworkers "would have too much movement."  If Williams saw an ironworker in violation of the OSHA tie-off standard, Williams could impose a fine but could not stop the work.  Williams was not present when plaintiff fell.  According to Williams' investigation report of the accident, plaintiff did not take the necessary precautions while moving across a beam and should have used a harness and lanyard.

MCL project manager Randy Grueb testified that subcontractors had to agree to abide by MCL's safety manual as part of the contract between MCL and Shelco.  Grueb relied on Shelco and Ketler as the experts for steel fabrication and erection, and Ketler was in charge of its own means and methods in erecting the steel.  Grueb explained that steel beams were prefabricated with penetrations and stiffeners; such work was done in the field after the steel was erected if plumbing or mechanical trades indicated that additional penetrations were necessary.  In that situation, a structural engineer approved the penetration, and an ironworker then marked and cut the steel.  Grueb never saw prefabricated steel arrive at a jobsite with marks indicating the location of stiffeners.

Grueb was at the site daily during construction and ran progress and safety meetings on a regular basis.  When Grueb observed ironworkers walking on beams without tying off, Grueb and Ketler foreman Gaynor talked about it, but Grueb could not recall whether the conduct constituted a violation of the safety manual or OSHA regulations.  Grueb was not present when plaintiff fell.

Shelco project manager John Hesseltine testified that Ketler was the expert in steel erection and was expected to do that work as Ketler saw fit.  Hesseltine was at the jobsite for a couple of hours about once a week and spoke with Ketler management to coordinate the delivery of the prefabricated steel with Ketler's schedule.  Hesseltine, the only Shelco representative ever at that jobsite, did not inspect Ketler's work.  Although Hesseltine could raise concerns to Ketler management, he could not supervise the ironworkers or tell them how to do their job.  Hesseltine never saw beams marked as an industry practice to indicate the presence of stiffeners.  According to Hesseltine, it was industry custom and practice to do as much work as possible in the shop so ironworkers were not working unnecessarily at heights and fall risks were minimized.  Furthermore, erecting the beams with penetrations and then welding stiffeners later was not feasible because a beam's own weight could cause it to buckle and fail.

Union business agent Bobby Sutton opined that the party making beam penetrations should also mark the beams to indicate the presence of stiffeners.  Robert Boskovich, president of the ironworkers local union, preferred field-fabricated stiffeners because ironworkers should be compensated for that installation as part of their work.  Sutton and Boskovich opined that stiffeners should be field fabricated rather than prefabricated because of the fall hazards they present.

Plaintiff's expert Peter Cucuz, a safety consultant and former OSHA compliance officer, safety supervisor, and auditor, opined that MCL controlled Ketler's work as it related to safety and was responsible for ensuring Ketler provided fall protection where plaintiff worked.  Cucuz stated that the "more progressive steel erectors" were providing 100% fall protection at 6 feet, but acknowledged that decking 2 floors or 25 feet below was the OSHA standard "we're stuck with" until the revised January 2002 standards took effect.  Cucuz opined that a potential existed for the ironworkers and plaintiff to fall more than 25 feet because Cucuz thought Kirincich was at the exterior of the building and the fifth floor was not completely decked.  Cucuz acknowledged that the building was the size of half a city block, but opined that the entire fifth floor should be completely decked to comply with the OSHA standard regardless of where ironworkers were working.  According to Cucuz, a stiffener created a tripping hazard for an ironworker straddling a beam and moving along the beam in a sitting position with his feet on the lower flange of the beam.

Shelco's expert Phillip Colleran, a safety consultant and former OSHA compliance officer, testified the OSHA two-floor decking standard in effect in 1997 was silent regarding access ways and did not require elevator shafts and other potential building openings to be covered during steel erection.  Colleran opined that MCL's safety director could recommend but did not have the authority to direct Ketler to use a six-foot fall protection rule for the job.  Colleran acknowledged general contract language whereby MCL could make a "directive," but stated it would be arbitrary and capricious to mandate Ketler's compliance with a six-foot tie-off rule, which was stricter than the OSHA standard and neither contemplated by nor consistent with the substance of their agreement.

Defendants MCL, MCL Management Corporation, and Shelco filed motions for summary judgment, arguing they lacked a duty to plaintiff because they did not retain sufficient control over Ketler's work.  Plaintiff filed briefs in opposition to MCL's and Shelco's motions but made no objection to the motion of MCL Management Corporation.  The circuit court granted summary judgment in favor of all defendants, and plaintiff appealed as to MCL and Shelco.

ANALYSIS

The purpose of summary judgment is not to try a question of fact, but to determine whether one exists.  
Gilbert v. Sycamore Municipal Hospital
, 156 Ill. 2d 511, 517 (1993).  Summary judgment is appropriate only where the pleadings, depositions, admissions and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1996); 
Vickers v. Abbott Laboratories
, 308 Ill. App. 3d 393, 399 (1999)
.  However, where material facts are disputed, the trial court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the facts presented in favor of the nonmovant.  
In re Estate of Hoover
, 155 Ill. 2d 402, 410-11 (1993).  While the summary judgment procedure should be encouraged as an aid in the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt.  
Purtill v. Hess
, 111 Ill. 2d 229, 240 (1986).  
We review a grant of summary judgment 
de
 
novo
.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 113 (1995).

On appeal, plaintiff contends MCL's and Shelco's conduct and the contract terms establish they retained sufficient control over the work to give rise to a duty to plaintiff under section 414 of the Restatement (Second) of Torts.

I.  Duty of Care to Independent Contractor's Employees

In 1907, our legislature enacted the Scaffold Act, later known as the Structural Work Act (see 740 ILCS 150/1 
et
 
seq.
 (West 1994)), 
to protect the workers engaged in that dangerous occupation.  
Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.
, 22 Ill. 2d 305, 317-18 (1961).
  Because the sole inquiry in Structural Work Act cases was an assessment of the defendant's culpability rather than the worker's conduct, 
the doctrines of assumed risk, contributory negligence and comparative negligence did not apply.  
Simmons v. Union Electric Co.
, 104 Ill. 2d 444, 459 (1984); 
Gannon
, 22 Ill. 2d at 317-18.  In 1911, when the legislature enacted the original version of what was later known as the Workers' Compensation Act (see 1911 Ill. Laws 315), structural workers' actions against their employers were limited to guaranteed disability payments, and actions against third-party nonemployer tortfeasors were barred pursuant to section 29 (see 
Gannon
, 22 Ill. 2d at 318).  However, after section 29 was held unconstitutional (
Grasse v. Dealer's Transport Co.
, 412 Ill. 179, 200 (1952)), injured workers were free to sue third-party tortfeasors, and litigation under the Structural Work Act enjoyed a revival (
Gannon
, 22 Ill. 2d at 318).

In 
Larson v. Commonwealth Edison, Co.
, 33 Ill. 2d 316, 325 (1965), our supreme court first recognized Restatement section 414 as an expression of Illinois common law negligence principles.  Common law negligence principles
 evolved with the adoption of the doctrines of contribution among joint tortfeasors (
Skinner v. Reed-Prentice Division Package Machinery Co.
, 70 Ill. 2d 1 (1977)), and comparative negligence (
Alvis v. Ribar
, 85 Ill. 2d 1 (1981)).  In 1994, the legislature repealed the Structural Work Act, which was survived by Restatement section 414.  Pub. Act 89-2, §5, eff. February 14, 1995
.  See also Comment, 
Illinois Construction Negligence, Post-Structural Work Act: The Need For A Clear Legislative Mandate
, 36 J. Marshall L. Rev. 531, 541-42 (2003) (general discussion of unsuccessful legislative attempts to revive the Structural Work Act).

A principal unknowledgeable about the details of some task usually delegates that work to an independent contractor.  As a general rule, one who employs an independent contractor is not liable for the acts or omissions of the latter.  
Rangel v. Brookhaven Constructors, Inc.
, 307 Ill. App. 3d 835, 838 (1999).  The rationale for the general rule is that a principal generally does not supervise the details of an independent contractor's work and, thus, is not in a good position to prevent negligent performance, whereas the essence of employment is that the employee submits to the employer's right to monitor and direct the details of the work in exchange for wages.  
Anderson v. Marathon Petroleum Co.
, 801 F.2d 936, 938 (7th Cir. 1986).  An independent contractor's employees are compensated for the risks of their employment by a combination of wages, benefits and entitlement to workers' compensation in the event of an accident.  Because the principal pays for that compensation indirectly by the contract price, the principal is motivated to ensure safe working conditions to reduce contract costs and contingent liability if the contractor fails to carry workers' compensation insurance and pay those benefits itself.  
Anderson
, 801 F.2d at 941.

Retained Control Exception

To ensure a successful project, the principal may conduct inspections, employ a manager to administer the project, or require contractors to comply with a safety manual.  A balance must be struck between a principal's legitimate interest in ensuring a successful project and the imposition of a duty of care when appropriate.  Section 414 of the Restatement (Second) of Torts
 states an exception to the general rule that a principal is not liable for the acts and omissions of an independent contractor.  Under this exception: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."  Restatement (Second) of Torts §414, at 387 (1965).

The demarcation between retained control and the lack thereof is not clear-cut.  The Restatement describes a continuum of control, explaining the employer is subject to liability as master under the principles of agency where the employer retains control over the operative detail of any part of the contractor's work.  Restatement (Second) of Torts §414, Comment 
a
, at 387 (1965).  If the employer retains only supervisory control, 
i.e.
, power to direct the order in which work is done, or to forbid its being done in a dangerous manner, then the employer is subject to liability under section 414 unless he exercised supervisory control with reasonable care.  Restatement (Second) of Torts §414, Comment 
a
, at 387 (1965).

When a principal contractor entrusts a part of the work to subcontractors but superintends the entire job through a foreman, the principal contractor is subject to liability if he (1) fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, (2) knows or should know the work was being so done, 
and
 (3) has the opportunity to prevent it by exercising his retained power of control.  Restatement (Second) of Torts §414, Comment 
b
, at 387-88 (1965).

However, the employer is not liable where:

"he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.  Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail.  There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."  Restatement (Second) of Torts §414, Comment 
c
, at 388 (1965).

To state a claim for negligence under section 414, the plaintiff must allege that the defendant owed him a duty and breached that duty, and that plaintiff's injury was proximately caused by the breach.  
Kotecki v. Walsh Construction Co.
, 333 Ill. App. 3d 583, 587 (2002).  Whether a duty exists is a question of law and, under section 414, turns on whether the defendant controls the work in such a manner that he should be held liable.  
Kotecki
, 333 Ill. App. 3d at 587.  The issues of breach and proximate cause are ordinarily questions of fact for the jury, provided that there is a genuine issue of material fact regarding those issues.  
Espinoza
, 165 Ill. 2d at 114.  Because plaintiff failed to raise a fact question on whether MCL or Shelco either retained a right of control over Ketler or exercised sufficient supervisory or operational control over Ketler to be held liable, the trial court properly awarded summary judgment to defendants.

Control by Contract

Plaintiff's argument that MCL, Shelco and Ketler's contractual relationship created an issue of retained control is not persuasive.  The contract between the owner and MCL establishes only that MCL reserved a general right to control construction means, methods, techniques, sequences, procedures, and coordination of its work under the contract, unless contracts gave other specific instructions concerning those matters.  All subcontractors assumed toward MCL all the obligations and responsibilities MCL assumed toward the owner and architect.  MCL subcontracted the steel fabrication and erection work, including the labor with proper supervision, to Shelco.  Shelco, in turn, subcontracted to Ketler the field labor to unload and erect the steel in accordance with the AISC Code, which provided the steel fabricator was not responsible for erection safety if the structure was erected by others.  See 
Kotecki
, 333 Ill. App. 3d at 588 (no duty to plaintiff established based on general contractor's reservation in contract of general right to supervision, which did not refer to a right to direct the specific work of the independent contractor); 
Rangel
, 307 Ill. App. 3d at 838-39 (same).

MCL was responsible for initiating and supervising its safety program, which entailed citing contractors for rule and regulation violations, maintaining reasonable safeguards, and designating a safety director whose duty was to prevent accidents.  We do not, however, equate those safety responsibilities with control over the means and methods of Ketler's steel erection work, particularly where Ketler maintained contractual control of the supervision and safety of its ironworkers.  Specifically, in accordance with MCL's safety program, Ketler furnished to MCL a safety manual, which provided, 
inter
 
alia
, that Ketler's foreman was responsible for putting the safety rules into practice and that ironworkers did not need to tie off when moving from point to point.

In 
Shaughnessy v. Skender Construction Co.
, 342 Ill. App. 3d 730, 738 (2003), the court reviewed similar contract language and determined such a general statement of control between the owner and the general contractor did not mean that the independent contractor was controlled as to his methods of work or as to operative detail.  We agree with the 
Shaughnessy
 court; if such general contract language alone was sufficient to subject a general contractor to liability under section 414, then the distinction in comment 
c
 to section 414 between retained control versus a general right of control would be rendered meaningless.

In 
Moss v. Rowe Construction Co.
, 344 Ill. App. 3d 772, 777 (2003), the court erroneously stated that the 
Shaughnessy
 court "disregarded" the above contract language.  The 
Moss
 court further misconstrued the holding in 
Shaughnessy
, stating the 
Shaughnessy
 court found the general contractor not subject to section 414 liability despite "evidence demonstrating that the defendant failed to" comply with its contractual responsibilities to maintain and supervise its safety program and employ a superintendent whose duties included the prevention of accidents.  
Moss
, 344 Ill. App. 3d at 782.  Even a cursory reading of 
Shaughnessy
 establishes 
that no facts indicated the defendants failed to comply with those contractual responsibilities.  
Shaughnessy
, 342 Ill. App. 3d at 733-36.  Specifically
, the 
Shaughnessy
 court considered the defendants' monitoring and supervision, including the general contractor's safety program, and determined that defendants neither undertook extensive supervision and monitoring, nor knew the worker created the unsafe condition that led to his injury.  
Shaughnessy
, 342 Ill. App. 3d at 739-40.  Thus, in accord with comment 
b
 of section 414, the 
Shaughnessy
 defendants were not subject to liability for failure to prevent an accident they knew or should have known about by virtue of an extensive work site presence.

Furthermore, in accord with comment 
c
 of section 414, the 
Shaughnessy
 court noted the undisputed facts established that the independent contractor's foreman instructed, supervised and directed the manner in which his crew did their work without interference from the defendants.  
Shaughnessy
, 342 Ill. App. 3d at 738.  The 
Shaughnessy
 court concluded, based on the facts concerning the defendants' retention or exercise of contractual, supervisory or operational control, that the plaintiff failed to present a genuine issue of material fact that defendants owed a duty to plaintiff under the retained control exception of section 414.  
Shaughnessy
, 342 Ill. App. 3d at 740.

Supervisory Control

Plaintiff fails to establish that defendants supervised Ketler's work or maintained an extensive work site presence and, thus, were liable for failure to exercise supervisory control with reasonable care.

Shelco's project manager was at the jobsite for only a couple of hours about once a week and spoke to Ketler management to coordinate steel deliveries.  MCL's safety director visited the site twice a week, whereas MCL's project manager was at the site on a daily basis.  Although these three men could raise safety concerns to Ketler's foremen, they could not stop the work or instruct or supervise the ironworkers.  
Cf.
  
Bokodi v. Foster Wheeler Robbins, Inc.
, 312 Ill. App. 3d 1051, 1063 (2000) 
(combination of defendants' extensive control of safety standards, including workers' required participation in defendants' safety program with no recourse for time; authority to instruct contractors' workers, stop their work, and give guidelines for personal grooming; and pervasive supervision and constant monitoring raised an issue of fact regarding whether defendants should have been aware of the unsafe lifting method that led to the plaintiff's injury); 
Brooks v. Midwest Grain Products of Illinois, Inc.
, 311 Ill. App. 3d 871, 874-75 (2000) (necessity of a permit and defendant's presence to answer questions before the contractor could begin burn and welding work raised an issue of fact regarding whether defendant prevented the contractor from proceeding with his duties until defendant confirmed the work was performed correctly).

There was no evidence the iron erection work was done in an unreasonably dangerous manner where plaintiff was working on an interior bay and complying with the OSHA tie-off standard, the ironworker standards in MCL's and Ketler's safety manuals, and the instructions and supervision of Ketler's foremen.  No one from MCL or Shelco was present when plaintiff fell, whereas Ketler foreman Gaynor was supervising the raising crew while Ketler foreman Kirincich was on the seventh floor with plaintiff supervising the decking work.  
In contrast, MCL safety director Williams worked on the ground, was not at the jobsite on a daily basis, and was not knowledgeable about steel erection or the hazards his tie-off suggestion posed to ironworkers.

Defendants did not retain or exercise authority over Ketler's method of operation.  Before the ironworkers commenced work, Ketler informed MCL that it could not comply with a six-foot tie-off rule.  Ketler insisted on the application of the 2-floor/25-foot OSHA standard for ironworkers, which MCL incorporated into its safety manual.  The parties agreed that ironworkers would tie off at six-foot heights when it was feasible to do so, but that feasibility determination would be made by the Ketler foremen.  Gaynor, who retained the authority to order his workers to tie off according to a standard stricter than the OSHA standard, determined that plaintiff should not tie off because he had to move freely from point to point.  Moreover, MCL did not shirk its responsibility to initiate, maintain and supervise its safety program, where MCL cited Ketler twice for problems regarding Ketler's OSHA perimeter cables and suggested a tie-off method to the Ketler foreman, who then rejected the suggestion.

Plaintiff asserts that the "central issue is the defendant's ability to affect worker safety."  See 
Moss
, 344 Ill. App. 3d at 772 ("The issue is not control of the 'means and methods' of performing the task, but rather who contractually and/or physically has the duty to control safety of the project").  We disagree.  
The central issue is retained control of the independent contractor's work, whether contractual, supervisory, operational, or some mix thereof.  The party who retains control is the logical party upon whom to impose a duty to ensure worker safety.  Penalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety.  A party who retains some control over the safety of the work has a duty to exercise that control with ordinary care.  Illinois Pattern Jury Instructions, Civil, No. 55.02 (Supp. 2003).  Nevertheless, the existence of a safety program, safety manual or safety director does not constitute
 retained control 
per
 
se
; the court must still conduct an analysis pursuant to the section 414 retained control exception.  See 
Moss
, 344 Ill. App. 3d at 784 (Cook, J., specially concurring).  We recognize, of course, that if a defendant's safety program sufficiently affected a contractor's means and methods of doing its work, then such program could bring the defendant within the ambit of the retained control exception.  See 
Moss
, 344 Ill. App. 3d at 775-76 (defendant was subject to section 414 liability where improperly placed equipment contributed to the worker's injury, contract terms limited the independent contractor's options regarding the placement of equipment, and defendant retained substantial contractual control of safety).

Operational Control

The facts establish that Ketler was free to perform its work in its own way and only Ketler exercised control over plaintiff's work.  Specifically, plaintiff, Ketler foremen Gaynor and Kirincich, MCL safety director Williams, and MCL project manager Grueb testified that the Ketler foremen exclusively gave all directions, supervision and orders to the Ketler crew.  Gaynor rejected MCL's six-foot tie-off suggestion and supervised his crew in accordance with the OSHA standard.  No one from MCL or Shelco was involved in Ketler's iron erection work or even present when plaintiff fell.  See 
Rangel
, 307 Ill. App. 3d at 839 (no retained control where the subcontractor provided all supplies and directions to its employees; plaintiff was injured when he followed the subcontractor's instructions for performing the work; there was no evidence that the general contractor was aware that the work was being done in an unsafe manner before the plaintiff was injured; and the general contractor's general reservation of the right of supervision did not translate into the control over details of the subcontractor's work necessary to expose the general contractor to liability).

Plaintiff cites several cases, notably 
Bokodi
, 312 Ill. App. 3d 1051; 
Ryan v. Mobil Oil Corp.
, 157 Ill. App. 3d 1069 (1987); 
Pasko v. Commonwealth Edison Co.
, 14 Ill. App. 3d 481 (1973);
 and 
Weber v. Northern Illinois Gas Co.
, 10 Ill. App. 3d 625 (1973), to support his contention that defendants owed him a duty of care.  We find those cases factually distinguishable because those defendants had extensive involvement with the operative details of the work.  See 
Ross v. Dae Julie, Inc.
, 341 Ill. App. 3d 1065, 1071-73 (2003) (general discussion of cases and facts concerning direct supervision or retention of authority to stop unsafe work).  Like the 
Ross
 court, we choose to follow the more recent line of cases, which incorporate comment 
c
 of section 414 into the duty analysis.  
Ross
, 341 Ill. App. 3d at 1073, citing 
Kotecki
, 333 Ill. App. 3d at 588-89, 
Bieruta v. Klein Creek Corp.
, 331 Ill. App. 3d 269, 278 (2002), 
Connaghan v. Caplice
, 325 Ill. App. 3d 245, 250 (2001), and 
Rangel
, 307 Ill. App. 3d at 839.

Furthermore, we reject plaintiff's contention that Shelco was liable for "direct negligence," where Shelco prefabricated penetrations and stiffeners in steel beams without marking the beams for warning purposes.  Plaintiff's "direct negligence" argument lacks merit; as discussed above, construction-related common law negligence liability of general contractors for employees of independent contractors is analyzed under section 414 of the Restatement (Second) of Torts.  Moreover, plaintiff cites no relevant authority to support his argument that "a duty should exist" to mark the beams.  In addition, the evidence established that plaintiff was aware of the presence of stiffeners at the jobsite, the stiffeners protruded beyond the edges of the beam flange and were visible from above, and there was no OSHA regulation or industry custom and practice concerning marking beams to warn for the presence of stiffeners.

Because the evidence here fails to indicate sufficient control by defendants over Ketler's or plaintiff's work under the retained control exception of section 414, plaintiff fails to raise a factual question necessary to survive summary judgment.

II.  Strict Products Liability

Next, plaintiff contends that the beam from which he fell was unreasonably dangerous, and Shelco, as the steel fabricator of the "defective product," should be held strictly liable for his injuries.

We disagree.  Based on policy considerations supporting the strict liability doctrine, courts have consistently held that buildings and indivisible component parts of the building structure itself, such as bricks, supporting beams and railings, are not deemed products for the purpose of strict liability in tort.  
Trent v. Brasch Manufacturing Co., Inc.
, 132 Ill. App. 3d 586, 590-92 (1985).
  Plaintiff fell from a steel beam that was bolted to the vertical columns and formed an indivisible component part of the structural skeleton of the new building.  Compare 
Hubbard v. Chicago Housing Authority
, 138 Ill. App. 3d 1013, 1016-17 (1985) (steam pipes incorporated into a building and not easily severable from the building were not a product); 
Walker v. Shell Chemical, Inc.
, 101 Ill. App. 3d 880, 883 (1981) (if guardrail was a component and indivisible part of entire building structure, it could not be considered a product); 
Lowrie v. City of Evanston
, 50 Ill. App. 3d 376, 384 (1977) (a multi-level, open-air garage was not a product), with 
Board of Education of City of Chicago v. A, C & S, Inc.
, 131 Ill. 2d 428, 451 (1989) (where raw asbestos was a product for purposes of strict liability, asbestos-containing plaster, tile, insulation and fireproofing installed in a building were products because the dangerous nature of those materials existed separate from the actual structure).  Accordingly, the trial court properly dismissed plaintiff's strict products liability claim against Shelco.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

O'MARA FROSSARD, P.J., and GALLAGHER, J., concurring.