2024 IL App (2d) 230209
No. 2-23-0209
Opinion filed July 16, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| THOMAS W. NEISENDORF, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 20-L-412 |
| | ) | |
| ABBEY PAVING & SEALCOATING, | ) | |
| COMPANY, INC., d/b/a Abbey Paving Co., | ) | |
| Inc., | ) | Honorable |
| | ) | Robert K. Villa, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff, Thomas W. Neisendorf, an employee of subcontractor Campton Construction, Inc. (Campton), sued defendant, general contractor Abbey Paving & Sealcoating Co., Inc., doing business as Abbey Paving Co., Inc. (Abbey), a trench wall collapsed on him at McHenry County's government center. The trial court granted Abbey summary judgment. Plaintiff appeals, arguing that the trial court erred in granting Abbey summary judgment, where there were material factual questions as to whether (1) Abbey retained sufficient control (contractual or otherwise) over Campton's work such that Abbey owed plaintiff a duty of care under section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)) (Restatement) and

(2) it had notice (actual or constructive) of a dangerous condition such that it owed plaintiff a duty of care under either section 414 or 343 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 343 (1965)). We affirm.

¶ 2                                 I. BACKGROUND

¶ 3                              A. Plaintiff's Complaint

¶ 4      On June 7, 2023, plaintiff sued Abbey. The complaint alleged as follows. On August 31, 2018, Abbey was the general contractor for excavation work at the county's property at 2200 North Seminary Drive in Woodstock. Abbey oversaw and supervised excavation, construction, repair, design, inspection, and removal and/or maintenance of a storm sewer line at the jobsite. Plaintiff was employed by subcontractor Campton and was on the premises on August 31. Abbey retained control for part of the work, including jobsite safety and compliance with Occupational Safety and Health Act of 1970 (OSHA) (29 U.S.C. § 651 *et seq.* (2012)) regulations for the project's trench excavation, and had the opportunity to prevent work by exercising the power of control it retained over the project. Plaintiff further alleged that Abbey owed a duty of care to exercise its supervisory control to prevent the work Abbey ordered from causing injury to others, including plaintiff. Abbey designated work methods, maintained and checked work progress, and participated in work scheduling and inspection. It also had the authority to stop the work, refuse work and materials, and order changes in the work in the event it was being performed in a dangerous and unsafe manner.

¶ 5      On August 31, 2018, plaintiff alleged, Abbey failed to erect, construct, or place a safe, suitable, and proper protective system for shoring walls to facilitate the construction/excavation project. It had the duty to exercise reasonable care in its control over the project and had a nondelegable duty to provide a safe workplace. Plaintiff was required to work in a trench more

than five feet deep to remove and replace a storm sewer line, but Abbey failed to inspect the premises, provide a safe workplace, or install adequate protective systems to prevent a dirt cave-in. The dirt wall collapsed on plaintiff, and, when he attempted to stop the wall from collapsing on him, his arm broke and his arm and hand were crushed. The collapsed trench wall also pinned in plaintiff's legs. Plaintiff suffered a left grade 2 open fracture of the distal radius and dislocation and fracture of the distal ulnar bone/radius bone at the wrist that required surgery.

¶ 6    Abbey denied the allegations and raised as affirmative defenses plaintiff's alleged contributory or comparative negligence, argued that any alleged unsafe conditions were open and obvious and known to plaintiff, denied it had any notice of unsafe conditions (and, thus, no duty to warn), denied that it had control over the operative details of the work performed by others (and, thus, owed plaintiff no duty of care), and argued that any injuries to plaintiff were proximately caused by others and not Abbey.

¶ 7                                    B. Contract

¶ 8    Abbey entered into a written contract with the county to perform work (parking lot reconstruction, storm system restructuring, and lighting system restructuring) as the general contractor at the county's government center. Abbey, in turn, pursuant to an oral agreement, hired Campton as a subcontractor to handle the project's underground sewer and sanitary installation and mass grading and foundation excavation.

¶ 9    Abbey's contract with the county, dated April 5, 2018, related to work at the county's government center parking lot. Section 9.2 addresses supervision and construction procedures and provides that Abbey "shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning

these matters." Also, it states that Abbey "shall be responsible to the Owner for acts and omissions of [Abbey's] employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of [Abbey] or any of its Subcontractors."

¶ 10 Section 16.1 addresses safety precautions and programs and provides that Abbey "shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the Contract. [Abbey] shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury, or loss to *** employees on the Work *and other persons who may be affected thereby*[.]" (Emphasis added.)

¶ 11                                    C. Depositions

¶ 12                                    1. Plaintiff

¶ 13 Plaintiff testified at his deposition that he started working for Campton in 2009 as a laborer. On August 31, 2018, the date of plaintiff's accident, Mark Bowgren was plaintiff's supervisor at Campton. Plaintiff received his daily work instructions exclusively from Bowgren and never from anyone at Abbey. The only time on August 31 that plaintiff saw someone wearing Abbey insignia or clothing was after his accident. That day, plaintiff was working on removing an existing storm sewer pipe and replacing it with a larger one. Plaintiff had performed such work for Campton on about one dozen projects. No other contractors were working in the vicinity of where Campton was working that day, and five Campton employees were working at the site. Plaintiff worked in the trench. Another employee dug out the trench the same day. Bowgren was in the area, but not always near the trench.

¶ 14 When asked if anyone from Abbey directed him into the trench on August 31, plaintiff replied, "They don't control my method. They don't control the safety of my method." He also

stated that no one from Abbey directed him to go into the trench. Just prior to the accident, another employee yelled at plaintiff to look out. When the trench wall collapsed, the dirt covered up plaintiff's body up to his shoulder and he had trouble breathing until an employee knocked away some dirt.

¶ 15    Plaintiff could not recall if, prior to his accident, he received training concerning trench safety during his tenure with Campton. A trench box keeps trench walls from collapsing in, and, when needed, Campton used one. Plaintiff would not make the decision whether to use it; it would be Mark Peterson (Campton's vice president) or Bowgren. The need for a trench box is related to the depth of a trench, which, in turn, is determined by the blueprints. Prior to the accident, in trenches similar in depth to the one where the accident occurred, a trench box would occasionally be used, depending on soil type. Plaintiff received training on recognition of soil after his accident. Prior to his accident, Campton used a trench box on the same project (months earlier). Shoring also protects walls from caving in and there was no shoring used on the site on the day of the accident, although it was used at some point on the project.

¶ 16    Plaintiff further testified that Abbey was "my boss's boss" and it "control[s] what happens on the job site." Abbey had the authority to control how the work was being carried out on the date of plaintiff's injury, because it was the general contractor. If someone from Abbey asked him to stop work due to safety reasons, he would stop. However, everyone on the job site had responsibility for safety.

¶ 17    Plaintiff saw Robert Buelow from Abbey at the jobsite; he was superintendent. He was, in plaintiff's view, in control of the jobsite and could make requests of Campton, including plaintiff. He could require Campton to use shoring.

¶ 18                                    2. Mark Peterson

¶ 19    Peterson, Campton's vice president, testified that he oversees billing, estimating, and crew scheduling and is the company's safety officer. He took OSHA "competent person"[1] training and is the competent person for Campton. The training involved reviewing OSHA standards and trenching. Also, Bowgren, Campton's foreman for plaintiff's crew, was a designated competent person. (After plaintiff's accident, all employees took the competent person course.)

¶ 20    For the county's project, Bowgren would have been overseeing the crew daily at the time of plaintiff's accident. Campton's job was to replace a storm line on the north side of the jail. Peterson would have been on the jobsite about once per week or every other week. On the day of plaintiff's injury, he was present at the site for a meeting to discuss a design issue. Buelow, Bowgren, and two representatives from the county were also present. Peterson did not go to the trench where the crew was working. He did not know if anyone from Abbey was present that day at the jobsite, other than for the design meeting. Peterson never saw Buelow by the trench. Bowgren, the designated competent person, was at the meeting and not at the trench at the time of plaintiff's accident.

¶ 21    The architect or civil engineer specified the depth of the trench, and Campton followed the plans. Abbey was not involved in digging the trench. Addressing decision making about whether to use shoring or support inside a trench, Peterson stated that it depends on several factors, including soil type and trench depth. As to the accident site, the plan was to start at 2.95 feet deep

---

[1]A "competent person" is defined as "one who is capable of identifying existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminate them." 29 C.F.R. § 1926.1401 (2010).

and end at 5.1 feet deep. "Typically[,] once you reach things that are four feet in depth we would either take some type of measure reducing the height of the trench wall or installing a trench box." As the digging occurs, a visual inspection is conducted to determine the soil type. Each of the workers was qualified to make the visual inspection, but Bowgren was the competent person. If a trench exceeds four feet in depth, it should be shelved/shored back or a trench box should be installed. The decision on whether shoring or a trench box would be used was made by employees in the field. Campton would not consult with Abbey on that decision. The process, from digging out a trench to backfilling it, takes about one hour.

¶ 22    Peterson did not witness plaintiff's accident. He heard yelling from where the crew was working, ran over to the trench, and then called emergency personnel.

¶ 23    Reviewing a video of the accident, Peterson testified that the trench was not shelved, which is not standard. It is also not standard for workers to stand or kneel directly on the edge of the trench, as one worker did in the video. They should stay two feet back from the edge of the trench. In his accident report, Peterson noted that workers used improper work technique; specifically, they failed to properly shelve the trench or to use a trench box. He also noted insufficient training in soil-type recognition. Also, an abandoned gas line (that was not on any plans or marked on the ground) was revealed after the trench caved in. It "caused a thin sliver of undisturbed dirt between the two ([the current and a previous excavation]) which gave it a natural shear point to come off that."

¶ 24    Campton did not have a written contract with Abbey at the time of plaintiff's accident. It does now. Peterson stated, "I have never had Abbey tell me a means and methods that I have to use to do my subcontract work I guess in that sense; but yes, they are responsible for me performing

my work correctly." If Abbey told Campton to stop working, Campton would stop. If Abbey told Campton that what it was doing was not safe and needed to stop, Campton would comply.

¶ 25     When asked how often representatives from Abbey were present at the jobsite, Peterson responded that they were rarely there, unless Abbey had crews working. Most times Peterson was on-site, he did not see Abbey representatives there. The nature of each company's operations does not lend itself to the companies' being there simultaneously. Abbey did not supply Campton with any equipment, and Abbey is not an excavating company. Peterson spoke to Buelow about once per week regarding progress and scheduling. During design meetings, Abbey did not tell Campton representatives how to do their work. "Abbey would hire us as the subcontractor to complete [any changes in the work] because it would be in a scope of work that they aren't familiar with."

¶ 26                                    3. Mark Bowgren

¶ 27     Bowgren, Campton's underground foreman, testified that he completed OSHA training several times while working for Campton. He also completed competent person training in October 2018, *i.e.*, after plaintiff's accident. Plaintiff was a member of Bowgren's underground crew, which also included Gilberto Huerta (heavy equipment operator who dug out the trench), Gabriel Oviedo-Gonzalez (top man assisting plaintiff), and William Hansen (heavy equipment operator who backfilled the trench). Bowgren testified that plaintiff had OSHA training before he started with Campton. Bowgren's job was to hand out assignments and get his crew started every day. Campton employees used Campton tools; Abbey provided no tools. He would be present the whole day and not leave the jobsite. Bowgren did not conduct safety or toolbox meetings.

¶ 28     Bowgren explained that each section of trench is about 16 feet long. Once it is dug out and the pipe is replaced, the trench is backfilled and the crew moves on to excavate the next trench.

No other company was doing this work at the jobsite. On the day of plaintiff's accident, Bowgren had a design meeting with Peterson and Buelow, along with two representatives from the county.

¶ 29    Bowgren also testified that, once a trench is deeper than five feet, the crew uses a trench box or shelving/shoring. The decision as to whether to use a trench box or shoring also depends on soil conditions, space, and size of equipment. Further, prior to plaintiff's accident, the crew found a pipe that was not marked in the blueprints, which, for safety reasons, precluded shoring. The crew did not want to hit the pipe. Huerta's machine could not lift any type of trench box, and his machine was the only machine that could fit in the space with the trench. Typically, as foreman, Bowgren is the person who decides whether to use a trench box or shoring. However, in the past, plaintiff would not always take Bowgren's suggestion. On the day of the accident, Bowgren did not give plaintiff any instructions concerning shoring. Whether to use shoring or a trench box was exclusively Campton's decision. Plaintiff was not at fault for the cave-in. When plaintiff's accident occurred, Bowgren was at the design meeting and Peterson came to get him to help plaintiff. The portion of trench that caved in was right over the gas pipe.

¶ 30    Plaintiff had experience with soil recognition from work prior to that with Campton. Prior to plaintiff's accident, no one on Bowgren's crew had training concerning shoring or trench boxes.

¶ 31    Campton never had safety meetings with Abbey on prior projects. Abbey never had questions or concerns about safety, nor were there any discussions between Abbey and Campton concerning safety. However, if someone from Abbey had come up to Bowgren on a job where Campton was the subcontractor and told his crew to stop, "then I stop. I mean we are working for them." According to Bowgren, "Abbey just gives us the timeframe basically. They provide all the information that we need to do the work, and that's pretty much how it goes." Bowgren answered no when asked if, at any point during the project, anyone from Abbey would come over and inspect

Campton's work. He explained: "[Abbey] would look at what had been done and how I had backfilled it to see if they can get in behind me and start doing [their] work." Buelow would not tell Bowgren what was next in the project. "He would let me do my thing, and like I said, he can't do anything until I'm done." Buelow would not tell Bowgren what was next in the project. "He would just let me do my thing, and like I said, he can't do anything until I'm done."

¶ 32    Bowgren communicated with someone from Abbey every day to check in on what work had been accomplished, and Abbey would then determine which portion of its work it could commence.

¶ 33                                      4. Robert Buelow

¶ 34    Buelow, project manager at Abbey, testified that he bids on work and runs work to ensure jobs get done and everyone goes home safe at the end of the day.

¶ 35    On the day of plaintiff's accident, no Abbey crews were on the jobsite. Buelow arrived before plaintiff's injury and was on-site for a meeting (with the engineer, the county, and Peterson) to discuss a utility conflict. The meeting issue was unrelated to Campton's work that day. When Abbey employees were not on-site, Buelow would stop by the site occasionally to check subcontractors' progress or attend meetings. The only safety meetings he had on-site were toolbox talks with his crews (*i.e.*, Abbey crews).

¶ 36    As project manager, Buelow did not instruct Campton employees how to do their work, but, if he saw "something unsafe, yes, I would say something to them." If he saw something that appeared to be unsafe, he had the authority to stop the Campton employees. When asked if he had the ability to stop the method and manner of Campton employees' work if he deemed it necessary, Buelow replied, "I would ask them to stop, yes." He also stated, "when it comes to means and methods, I don't have any control over that." As to the manner in which the work was being done,

he stated that Campton controlled what it did. "If I seen [*sic*] something that was happening wrong, would I say something? Yes." "We do not control Campton's safety." He believed, however, that the contract gave him the right to.

¶ 37 Buelow was a competent person, but Abbey had no work at the site on the day of plaintiff's accident. A competent person may stop work and/or make corrections. He could inspect Campton's work at any time. Buelow never gave Campton employees specific instructions on their daily tasks on the county's project. Any decisions concerning trench safety or trench boxes were Campton's. Abbey did not provide any materials or construction equipment to Campton.

¶ 38 On the day of plaintiff's accident, Buelow was on-site when the trench was being dug but was not near the trench, nor was it within his field of view. He did not see the trench until after the accident. As a general contractor, Buelow was Peterson's boss as related to what needed to be done for Campton's part of the project. He could not recall when Campton started digging the trench that collapsed. Nothing prevented Buelow from observing the work happening inside the trench if he walked to the trench; however, he was in the meeting.

¶ 39 Buelow saw himself on surveillance footage, at the 7:28 time stamp, arrive on-site in his vehicle, and the trench collapsed about four minutes after he arrived (or about two minutes after he walked to the meeting site). After plaintiff's accident, Buelow spoke to Peterson "about them setting up some training with OSHA on trench safety," upon which Campton followed up. Abbey continues to work with Campton.

¶ 40                          5. Additional Campton Employees

¶ 41 Huerta, a heavy equipment operator for Campton, testified that he worked for the company for 30 years. He had trench safety training earlier in his career. On the day of plaintiff's accident, Huerta operated a mini hoe that was provided by Campton. (He assumed Bowgren, his supervisor,

was a designated competent person. Huerta was not a competent person.) Huerta was not aware who the general contractor was on the project.

¶ 42   Campton held daily meetings at the site to review work for the day. Huerta received all his instructions about daily tasks from Campton. He never spoke to anyone from Abbey at the jobsite, nor did he see anyone from Abbey there.

¶ 43   At the jobsite, Huerta dug out the trenches and plaintiff was the bott man who was inside the trench. Oviedo-Gonzalez, the top man, handed things to plaintiff. Hansen was a support staff operator who backfilled the trench. The trench plaintiff was in the day of the accident was dug out the same day. Bowgren instructed the crew how deep to dig a trench. Campton did not use shoring but, rather, would use a trench box. A trench box was used when a trench was over five feet deep or if the ground was sandy or gravely or had running water. If Campton knew there would be a deep dig, it would bring the trench boxes. Bowgren, plaintiff, and Huerta were the underground team members who would make the decision whether to use a trench box. The decision on whether to use a trench box was Campton's alone. On the day of plaintiff's accident, there was no discussion about using a trench box. Huerta had no concerns about needing a trench box, because they dug only four feet down.

¶ 44   Huerta witnessed plaintiff's accident. Bowgren was not near the trench at the time of the accident. Plaintiff was standing on the pipe getting ready to get out when, suddenly, the trench caved in.

¶ 45   Hansen, a heavy equipment operator for Campton, testified that, on the day of plaintiff's accident, he backfilled the trench and brought the pipe. All of the equipment he used was provided by Campton, and all the instructions he received at the jobsite came from Bowgren. It was not Hansen's role to decide whether to use a trench box or shoring. Typically, the "bottom guy" makes

the call against the digger (Huerta) when the ground is bad. The person then informs Bowgren whether the ground is "bad," *i.e.*, soft dirt, and whether they need a trench box.

¶ 46    Hansen further testified that there was a trench box on the jobsite but at a different location, where the crew was performing a deeper excavation that required it. Generally, if a trench is shallower than five feet, a trench box is not used. If there is room on the sides, the crew shelves it out. On the day of the accident, the trench in which plaintiff worked was not shelved out because there was a gas line present on the side. After plaintiff's accident, at Campton's direction, Hansen completed trench certification.

¶ 47    Hansen saw Abbey personnel on the site about two to three times per week. No one from Abbey ever had a conversation with Hansen about his job. If they had instructed him to stop work because it was not safe, he would have stopped.

¶ 48    Oviedo-Gonzalez, a laborer for Campton, testified that he took a trenching class at one point. After plaintiff's accident, he took OSHA training. Also, Campton conducted safety meetings. At the jobsite, Oviedo-Gonzalez worked as a top man, which involved standing outside of the trench and handing things to the person in the trench—the bottom man (*i.e.*, plaintiff). Oviedo-Gonzalez received all his instructions on his daily tasks from Bowgren.

¶ 49    Oviedo-Gonzalez witnessed plaintiff's accident. There was a trench box at the site on the day of plaintiff's accident. Any Campton employee can request a trench box. Oviedo-Gonzelez did not believe that the trench was deep enough that day to warrant a trench box. If someone from Abbey requested that he stop digging the hole or put in a trench box, Oviedo-Gonzalez would have complied.

¶ 50                     D. Abbey's Motion for Summary Judgment

¶ 51    On December 21, 2022, Abbey moved for summary judgment (735 ILCS 5/2-1005 (West 2022)), asserting that (1) it owed no duty to plaintiff given that it did not retain the requisite control of the operative details of Campton's work and (2) it had no notice, actual or constructive, of the alleged dangerous condition posed by the unsecured trench.

¶ 52    As to control, Abbey argued that it did not owe a duty to plaintiff because it did not exercise the requisite control over the operative details of Campton's work, including Campton's means and methods. It argued that Abbey did not direct or intervene in Campton's work, all work instructions for Campton's employees came from the Campton supervisor, Campton had its own safety officer and held periodic safety meetings with its employees, and plaintiff testified that Abbey did not control the safety of his "method."

¶ 53    As to notice, Abbey argued that, even if it had the requisite control over Campton's work, it had no actual or constructive notice of the unsecured and unsupported trench. As to actual notice, Abbey argued that it did not dig out the trench, no one from Abbey was on the site at any point that day, Abbey's Buelow arrived on-site about four minutes before the accident and did not see the trench prior to the accident, any decision on whether to use a trench box or shoring was exclusively Campton's, and Abbey was not consulted on the use of a trench box or shoring. Abbey argued as to constructive notice that the unsecured trench did not exist for enough time to constitute constructive notice. Peterson estimated that the entire process, including the final pipe replacement and backfilling of the trench, would take no longer than one hour, and Campton had not even completed the pipe replacement; thus, the time between digging out the trench and its collapse was significantly shorter than one hour.

¶ 54                              E. Trial Court's Ruling

¶ 55    On June 7, 2023, the trial court granted Abbey's summary judgment motion. Addressing the negligence claims (counts I and III), the court found that there was no evidence that Abbey entered into an agreement with Campton "that could be analyzed for distribution of jobsite responsibility." Abbey's contract with the county, the court determined, "created no automatic duty owed to plaintiff." The court found that Abbey did not retain any control over the incidental aspects of Campton's work. The court noted plaintiff's testimony that, "[t]hey don't control the safety of my method." It also noted that Campton provided its own materials and equipment, that all work instructions for Campton's employees came from the Campton supervisor, Campton's employees did not receive instructions from Abbey (and Abbey's representatives were rarely on site), Campton's jobsite foreman testified that he spoke with an Abbey representative only about the project's timeframe and that he was otherwise allowed to "do his thing" at the site, Campton had its own designated safety officer and held periodic safety meetings with its employees, and Abbey did not hold any safety meetings for Campton employees.

¶ 56    Addressing premises liability (count II), the trial court found that Abbey did not have actual or constructive notice that the trench in which plaintiff was working presented an unsafe condition. Campton maintained responsibility for the trench work, not Abbey. Further, Abbey did not have sufficient notice of the trench's potentially unsafe condition so as to impose liability. The trench, the court found, was excavated by Campton on the date of the accident "just shortly (perhaps one hour) before" plaintiff sustained his injuries. "No one from Abbey was on site at any point that day." Thus, no Abbey representative had the opportunity to see the trench prior to its collapse. Buelow, the court noted, testified that he was on-site for about four minutes before the collapse and never saw the trench or had the opportunity to observe it prior to its collapse. Further, no one consulted with Abbey concerning the use of a trench box or shoring. Peterson, Campton's vice

president, the court noted, testified that Abbey would not have been involved with securing or shoring up the trench. Accordingly, Abbey had no notice that the trench presented a dangerous condition to plaintiff. Plaintiff appeals.

¶ 57                                    II. ANALYSIS

¶ 58     Plaintiff argues that the trial court erred in granting Abbey summary judgment, where there were material factual questions as to whether (1) Abbey retained sufficient control (contractual or otherwise) over Campton's work such that it owed plaintiff a duty of care under section 414 of the Restatement and (2) Abbey had notice (actual or constructive) of a dangerous condition such that it owed plaintiff a duty of care under either section 343 or 414 of the Restatement. For the following reasons, we reject plaintiff's arguments.

¶ 59     Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, affidavits, and admissions on file show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* § 2-1005(c); *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). A genuine issue of material fact exists where the material facts are disputed or when the material facts are undisputed but reasonable persons can draw different inferences from the facts. *Williams v. Bruscato*, 2019 IL App (2d) 170779, ¶ 15. Summary judgment is a drastic measure and should be granted only when the movant is clearly entitled to judgment. *Id.* We review *de novo* a grant of summary judgment. *U.S. Bank N.A. v. Gold*, 2019 IL App (2d) 180451, ¶ 7.

¶ 60     To succeed in an action for negligence, the plaintiff must establish that the defendant owed a duty to the plaintiff, defendant breached that duty, and the breach proximately caused injury to the plaintiff. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 227 (1996). A legal duty refers to a relationship between the defendant and the plaintiff such that the law imposes on the defendant

an obligation of reasonable conduct for the benefit of the plaintiff. *Iseberg v. Gross*, 227 Ill. 2d 78, 87 (2007); *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987). Absent a duty, "no recovery by the plaintiff is possible as a matter of law." *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991). The existence of a duty under a particular set of circumstances is a question of law for the court to decide. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 445 (1996); *Vesey*, 145 Ill. 2d at 411.

¶ 61                                    A. Duty—Control

¶ 62     Plaintiff argues first that, under its contract with the county, Abbey assumed control over safety precautions and programs in connection with performance of the contract and, because there was no written contract between Abbey and Campton, Abbey did not delegate to Campton any such control. The trial court, he argues, should have found that Abbey had control over jobsite safety under its contract with the county and, thus, owed a duty to plaintiff.

¶ 63     In construction-injury cases, we analyze common-law negligence under section 414 of the Restatement. *Snow v. Power Construction Co.*, 2017 IL App (1st) 151226, ¶ 50. In *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201 (2005), this court explained the duty of care under section 414 of the Restatement and the retained control exception:

> "Generally, one who employs an independent contractor is not liable for the latter's acts or omissions. *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 838 (1999). In Illinois, a recognized exception to this rule is found in section 414 of the Restatement (Second) of Torts (*Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325 (1965)), which states:
>
> > 'One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for

whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.' Restatement (Second) of Torts § 414, at 387 (1965)." *Id.* at 204-05.

¶ 64 "The comments accompanying section 414 'describe a continuum of control' and provide some illumination as to the necessary degree of control a defendant must exercise to be subject to liability under this section." *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 341 (2008) (quoting *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 314 (2004)).

¶ 65 Comment *a* to section 414 explains:

"If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Restatement (Second) of Torts § 414 cmt. a, at 387 (1965).

¶ 66 Comment *a* "distinguishes between vicarious and direct liability." *Calderon*, 381 Ill. App. 3d at 341. It "clarifies that 'the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for

not exercising [its] supervisory control with reasonable care.' " *Id.* (quoting *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 874 (2005)).

¶ 67   "Comment *b* provides further illumination on the theory of direct liability described in Comment *a*." *Id.* Comment *b* to section 414 states:

"The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so." Restatement (Second) of Torts § 414 cmt. b, at 387-88 (1965).

¶ 68   Comment *c*, on the other hand, describes the necessary degree of retained control a general contractor must exercise to be subject to vicarious liability, limiting the scope of the "retained control" exception. *Calderon*, 381 Ill. App. 3d at 342. Comment *c* states:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is

usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. *There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*" (Emphasis added.) Restatement (Second) of Torts § 414 cmt. c, at 388 (1965).

¶ 69 Thus,

"even where the employer or general contractor retains the right to inspect the work done, orders changes to the specifications and plans, and ensures that safety precautions are observed and the work is done in a safe manner, no liability will be imposed on the employer or general contractor unless the evidence shows the employer or general contractor retained control over the 'incidental aspects' of the independent contractor's work." *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 839 (1999).

¶ 70 The retained control issue is typically a factual question. *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1059 (2000). However, the interpretation of a contract is a question of law and, therefore, may be decided on a motion for summary judgment. *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 36.

¶ 71                                    1. Contract

¶ 72 Plaintiff argues first that the contract between the county and Abbey controlled Abbey's retention of safety over the jobsite and there was no contract between Abbey and Campton that "disputes" who is in control over jobsite safety. Thus, he asserts, Abbey controlled safety of the jobsite and owed a duty to plaintiff.

¶ 73 Generally, "[t]he best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 74 (2007). "A party retaining some control over the safety of the work then has a duty to exercise

its control with ordinary care." *Foley v. Builtech Construction, Inc.*, 2019 IL App (1st) 180941, ¶ 57. Specifically, "only the party with retained control 'over incidental aspects of the work' should be charged with the responsibility of preventing negligent performance." *Id.* ¶ 65 (citing *Fonseca v. Clark Construction Group, LLC*, 2014 IL App (1st) 130308, ¶ 29).[2]

¶ 74    A general right to enforce safety does *not* amount to retained control under section 414 of the Restatement. *Joyce*, 371 Ill. App. 3d at 74. "The mere existence of a safety program, safety manual, or safety director is insufficient to trigger [section 414]." *Madden v. F.H. Paschen/S.N. Nielson, Inc.*, 395 Ill. App. 3d 362, 382 (2009). "Even if a general contractor retains the right to inspect work, orders changes to the plans, and ensures that safety precautions are observed and the work is done safely, the general contractor will not be held liable unless the evidence shows that

---

[2]Some cases separately analyze vicarious and direct liability under section 414. See, *e.g.*, *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771 (and cases cited therein). However, the parties do not separately address the concepts, and the factors relevant to the analyses greatly overlap. *Id.* ¶¶ 74, 99 (addressing retained control for *vicarious* liability purposes by assessing contractual, supervisory, and/or operational control over the independent contractor's work; then addressing retained control for *direct* liability purposes by assessing "the employer's actual exercise of its discretionary authority to stop its contractor's work," whether the general contractor required compliance with extensive safety guidelines, conducted regular safety meetings and inspections, whether it was required to approve the site safety plan and minutes of the subcontractor's safety meetings, and whether the general contractor had actual or constructive knowledge of the unsafe work methods or a dangerous condition).

the general contractor retained control over the incidental aspects of the independent contractor's work." *Fonseca*, 2014 IL App (1st) 130308, ¶ 28 (citing *Rangel*, 307 Ill. App. 3d at 839).

¶ 75 Here, there was no written contract between Abbey and Campton. The contract between the county and Abbey provides, in section 9.2, that Abbey "shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters." It also provides, in section 16.1, that Abbey "shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the Contract. [Abbey] shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury, or loss to *** employees on the Work *and other persons who may be affected thereby*[.]" (Emphasis added.)

¶ 76 Plaintiff relies on *Moorehead v. Mustang Construction Co.*, 354 Ill. App. 3d 456 (2004), where the reviewing court reversed summary judgment for the general contractor. *Id.* at 457. In *Moorehead*, the court held that the plaintiff sufficiently alleged that the general contractor owed him a duty under section 414 of the Restatement. *Id.* at 460. In that case, the contract between a college and the general contractor provided that the general contractor agreed to " 'be fully and solely responsible for the jobsite safety' of the means, methods, and techniques of construction" (*id.* at 457), agreed to take safety precautions for employees under the control of the subcontractor, agreed to designate a safety director, and provided that the general contractor could order the work to stop if there were safety concerns. There was also a subcontract between the general contractor and the subcontractor that incorporated the general contract and added that the subcontractor agreed to safeguard against injuries and comply with all safety requirements. Further, the general

contractor's project manager supervised the project daily, inspected the work to ensure compliance with plans and that it was being performed in a safe manner, and held regular construction meetings with subcontractors to discuss scheduling and safety issues. The general contractor's safety director, in turn, also conducted weekly safety inspections. The *Moorehead* court held that a duty was sufficiently alleged, where the general contractor was responsible for initiating and maintaining all safety procedures, initiated a safety program and designated an individual whose sole function was to investigate for safety concerns, and had the authority to stop work if there were safety concerns and where its safety manager inspected the site weekly to ensure compliance with safety standards. *Id.* at 460. Finally, the court rejected the argument that, per the subcontract, the subcontractor assumed the general contractor's duty to control safety. *Id.* at 461. The court concluded that the general contract's language that the general contractor was fully and solely responsible for safety precluded it from replacing its primary obligation to control safety. *Id.*

¶ 77    Here, plaintiff argues that, like the contract between the general contractor and the college in *Moorehead*, the contract between Abbey and the county states that Abbey will be "solely responsible for" and "have control over" the means, methods, techniques, sequences, procedures, and coordination of all portions of work under the contract. Also, plaintiff contends, like the general contract in *Moorehead*, the contract here gives Abbey responsibility over safety precautions and programs in connection with performance of the contract. Further, plaintiff argues that, because there is no contract between Abbey and Campton, Abbey cannot argue that Campton assumed Abbey's obligation to control safety.

¶ 78    We find *Moorehead* easily distinguishable. The reviewing court did not analyze the general contractor's contract with the college and merely mentioned that the general contractor had the authority to stop work. The general contract provided that the general contractor agreed to be fully

and solely responsible for jobsite safety of the means, methods, and techniques of construction; it also agreed to designate a safety director and that it could stop work for safety reasons; and it agreed to take reasonable precautions for subcontractor employee and equipment safety. Here, Abbey's contract with the county provides that it "shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures" and that it was responsible for "all safety precautions and programs" and "shall provide reasonable protection to prevent damage, injury, or loss to *** employees *** and other persons who may be affected thereby." In contrast to *Moorehead*, Abby did not contract to designate a safety director or to specifically take certain precautions to ensure safety for subcontractors' employees and their equipment. Further, the facts in *Moorehead* are distinguishable from this case. In *Moorehead*, the general contractor's project manager held regular meetings with subcontractors to discuss safety issues and its safety director conducted weekly safety inspections and wrote memos concerning safety concerns. Thus, it had greater control over safety issues than Abbey did here. Abbey, as we discuss below, did not hold safety meetings with Campton personnel, nor did it conduct safety inspections or write memos concerning safety concerns.

¶ 79    Several cases with language like the contract here are helpful to our analysis. First, *Cochran*, 358 Ill. App. 3d 865, involved a standard form general contract (and no subcontract) that contained *identical* language to the contract in this case, and the reviewing court affirmed summary judgment for the general contractor. *Id.* at 867. Specifically, the contract provided that the general contractor " 'shall be solely responsible for and have control over the construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract.' " *Id.* at 868. It also provided that " '[t]he Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the

performance of the Contract.' " *Id.* at 869. In addition, the evidence reflected that the general contractor had general control over its subcontractors' work but had authority to stop work that was conducted in an unsafe manner; it also required subcontractors to have safety protocols, and its field superintendent walked through the jobsite and looked for hazards. The general contractor did not instruct the subcontractors' employees on how to do their work or provide them with any tools. In affirming summary judgment for the general contractor, the court noted that the general contractor

> "did not employ a full-time safety manager, did not conduct safety meetings for its subcontractors, did not require its superintendent to do a daily 'walk-through,' did not get involved in the specific details of the subcontractors' safety means, did not actively inspect for safety violations, and only empowered its 'competent persons,' as opposed to all of its employees, to halt the subcontractors' work upon observing safety violations." *Id.* at 877.

The court stated that there was no basis for vicarious liability under section 414 of the Restatement, where no evidence showed that the general contractor controlled the operative details of the subcontractor's work such that the subcontractor's "employees were not entirely free to perform the work in their own way." *Id.* at 879.

¶ 80 Similarly, in *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 732-33 (2003), the contract between a racquet club and the general contractor was a standard form agreement that provided that the general contractor "would supervise and direct the work and be responsible for and control the construction means, methods, techniques, sequences and procedures for coordinating all portions of the work" and "be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the contract and *** employ a superintendent whose duties included the prevention

of accidents." (A subcontract between the general contractor and the subcontractor provided merely that the subcontractor was to furnish labor, equipment, and supervision to install a metal deck, and a sub-subcontract between the subcontractor and the sub-subcontractor provided that the sub-subcontractor was to provide labor, equipment, and supervision to unload and erect a deck.) The general contractor acknowledged that, contractually, its personnel had authority to stop unsafe work and had discretionary authority to provide equipment to a subcontractor if requested. As to the general contract's language, the court affirmed summary judgment for the general contractor and subcontractor against the sub-subcontractor, holding that the contract "establish[ed] only that [the general contractor] and [the subcontractor] reserved a general right to stop, start and inspect the progress of the work." *Id.* at 738.

¶ 81 Based on the foregoing case law, we reject plaintiff's argument that the contract between the county and Abbey shows that Abbey owed a duty to plaintiff under section 414 of the Restatement. *Cochran* and *Shaughnessy* warrant this conclusion. The contract here did not grant Abbey control over the operative details of Campton's work, and had only the general right to stop work. These are insufficient to grant it the requisite contractual control.

¶ 82                                   2. Power to Stop Work

¶ 83 Next, plaintiff argues that, notwithstanding the contract, because Abbey had the power to stop Campton from performing unsafe work, Abbey had sufficient control to invoke a duty to exercise its supervisory control with reasonable care under section 414 of the Restatement. Specifically, plaintiff asserts that there is some evidence that Buelow was usually on the jobsite about once per day and was in control of the site. Also, plaintiff notes that Bowgren communicated with Buelow or someone from Abbey nearly every day. Buelow had the ability to stop the manner and method of Campton's work if he deemed it necessary. Indeed, plaintiff notes, Buelow testified

that he believed that any of his employees had the right to stop Campton's work if they saw something unsafe. Also, plaintiff notes that Campton's employees agreed that Abbey had the power to stop any work that Abbey deemed unsafe. He also contends that, after his accident, Buelow spoke to Peterson and Bowgren about setting up OSHA training on trench safety, upon which they followed through. Plaintiff contends that the determinative factor is whether the general contractor had the *power* to stop work that it found to be unsafe, not whether it *actually exercised* such power. The trial court's reliance on Abbey not exercising its control, he argues, was an improper basis on which to grant summary judgment.

¶ 84    Even if a contract provides no evidence that the defendant retained control, "evidence of the defendant's conduct at variance with the agreement may still demonstrate that control." *Foley*, 2019 IL App (1st) 180941, ¶ 57; see *Cain v. Joe Contarino Inc.*, 2014 IL App (2d) 130482, ¶ 86 (courts "can find retained control despite the contract language if the parties' course of conduct demonstrates such control").

¶ 85    The general right to stop work is not sufficient to impose a duty on a general contractor pursuant to section 414 of the Restatement. *Calderon*, 381 Ill. App. 3d at 344. Further "[a] general right to enforce safety *** does not amount to retained control under section 414." *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 47; see *Cain*, 2014 IL App (2d) 130482, ¶ 106 (same). "[T]he existence of a safety program, safety manual or safety director does not constitute retained control *per se*." *Martens*, 347 Ill. App. 3d at 318. This is so because "[p]enalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety." *Id.* at 318. Thus, a safety program or manual must " 'sufficiently affect[ ] a contractor's means and methods of doing its work' " to " 'bring the defendant within the ambit of the retained control exception.' "

*Cochran*, 358 Ill. App. 3d at 876 (quoting *Martens*, 347 Ill. App. 3d at 318-19). Finally, "even multiple daily employer visits to a work site will not raise a genuine issue of retained control where the employer's responsibility was primarily focused on checking daily progress, not supervising the manner in which the work was done." *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771, ¶ 89 (citing cases).

¶ 86     Plaintiff relies on several cases, arguing that they illustrate that a general contractor may retain only the power to forbid that work be done in a dangerous manner (not that it need exercise its control over the safety of a project). However, the safety controls in those cases were far more extensive than those in this case. See, *e.g.*, *Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 497 (2008) (reversing summary judgment for the general contractor, where the contract between the general contractor and the subcontractor required the subcontractor to comply with the general contractor's list of 21 safety regulations, hold weekly safety meetings and submit minutes to the general contractor, prepare and submit for the general contractor's approval a site-specific safety plan, and attend the general contractor's weekly safety meetings; although the contract between the general contractor and the subcontractor left to the subcontractor the operative details of its work and its employees' safety, the general contractor "retained more than a general right of supervision"; this included a letter asserting the general contractor's discretionary authority to stop the subcontractor's work); *Bokodi*, 312 Ill. App. 3d at 1062-64 (reversing summary judgment for the general contractor, where the general contractor established its own safety program and appointed a safety manager to seek out safety hazards, the subcontractors' agreement contained 29 safety measures and procedures required by the general contractor, subcontractors were required to conduct weekly safety meetings that the general contractor had the right to monitor, subcontractors were instructed by the general contractor concerning protective

equipment and clothes and given guidelines for personal grooming, and they were told where to erect barricades and warning lights and to notify adjacent landowners if work affected them; the general contractor also could halt subcontractors' work for safety violations and shut down work until safety breaches were alleviated, and the general contractor constantly monitored subcontractors' work; thus, the general contractor retained control over operative details of the work, superintended the job, and retained the right of supervision in that subcontractors were not free to do their work their own way).

¶ 87      We reject plaintiff's argument that the fact that Abbey could stop work was itself sufficient evidence of control under section 414 of the Restatement. *Bokodi* does not stand for this proposition. It cites a general statement that the power to stop work is the type of power retained by an employer that could subject it to liability. *Bokodi*, 312 Ill. App. 3d at 1063-64 (citing *Ryan v. Mobil Oil Corp.*, 157 Ill. App. 3d 1069, 1078 (1987), citing *Pasko v. Commonwealth Edison Co.*, 14 Ill. App. 3d 481, 488 (1973)). However, it also cites section 414 of the Restatement, specifically comment *c*, which provides,

> " '[i]t is not enough that [the employer] has merely a general right to order the work stopped or resumed ***. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.' " *Id.* at 1059 (quoting Restatement (Second) of Torts § 414 cmt. c, at 388 (1965)).

See *Wilkerson*, 379 Ill. App. 3d at 494 (citing Restatement (Second) of Torts § 414 cmt. c, at 388 (1965)).

¶ 88    Plaintiff also relies on comment *a* to the Restatement, which provides that an employer who retains the power to forbid work being done "may be liable" unless it exercises supervisory control with reasonable care. Restatement (Second) of Torts § 414 cmt. a, at 387 (1965). However, this reliance is misplaced because comment *a* does not state that the employer *shall be* or *is* liable. Further, the cases upon which he relies also misread the concept in comment *a* and/or are otherwise factually distinguishable. See *Foley*, 2019 IL App (1st) 180941, ¶¶ 2, 60, 78 (reversing summary judgment for the general contractor; general contractor had authority to inspect subcontractor's materials; deposition testimony was "confusing" and there was a question of how much retained control the general contractor had; also, factual question existed as to whether the case "involve[d] less than a specific prohibition of one means or method of performing the work *** or more than the complete lack of supervision seen in the other cases"); *Claudy v. City of Sycamore*, 170 Ill. App. 3d 990, 995 (1988) (reversing summary judgment for general contractor city; city's control over subcontractor included that its representative visited work sites, city had the right to stop the subcontractor's work, and city had the right to remove employees of the subcontractor). Also, direct liability, as noted in comment *a* and elaborated upon in comment *b*, requires actual or constructive knowledge, which we discuss in the next section (as it is also relevant to premises liability). See *Cochran*, 358 Ill. App. 3d at 879-80 ("According to comment *b* to section 414, the general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability.").

¶ 89    Here, the evidence was undisputed that the power over safety issues that Abbey had over Campton was a general power. Peterson testified that, if Abbey told Campton to stop working, Campton would stop. Bowgren testified that Campton never had safety meetings with Abbey on prior projects, Abbey never had questions or concerns about safety, nor were there any discussions

between Abbey and Campton concerning safety. If Abbey were to ask Bowgren to stop work, "then I stop. I mean we are working for them." Plaintiff testified similarly. Buelow testified that, if he saw something that appeared to be unsafe, he had the authority to stop Campton employees' work. Further, as a competent person, he could stop work. He could also inspect Campton's work at any time. However, Buelow further testified that he never gave Campton employees specific instructions on their daily tasks on the county's project, and any decisions concerning trench safety or trench boxes were Campton's decisions. He also testified that the only safety meetings he had on-site were toolbox talks with his (*i.e.*, Abbey's) crews. Finally, Campton employees Hansen and Olviedo-Gonzalez testified that they would have stopped their work if Abbey instructed them to do so for safety reasons.

¶ 90 We believe the circumstances here are like cases finding in general contractors' favor. See, *e.g.*, *Downs*, 358 Ill. App. 3d at 206 (affirming summary judgment for the general contractor in a trench collapse case; holding that the general contractor was not responsible for safety measures at the site, where the contract between it and the subcontractor provided that the general contractor could order work to start or stop, order changes to the plans, and approve workers and subcontractors or material suppliers hired by the subcontractor; the general contractor relied on the subcontractors for safety and did not provide them with classes, inspections, or equipment; thus, the general contractor did not control safety measures at the site and its powers were general rights of supervision, not a retention of control over incidental aspects of subcontractor's work); *Shaughnessy*, 342 Ill. App. 3d at 738-41 (affirming summary judgment for the general contractor; contract between it and the property owner provided that the general contractor was responsible for the construction means and methods for all portions of the work and for initiating and maintaining and supervising all safety programs; the general contractor did not control manner in

which the plaintiff completed his work; the subcontractor furnished its own equipment; the subcontractor's foreman instructed the subcontractor's crew; and the general contractor had no notice of the plaintiff's acts that led to his injury); *Bieruta v. Klein Creek Corp.*, 331 Ill. App. 3d 269, 276-78 (2002) (affirming summary judgment for the general contractor; no indication that the general contractor exerted any control over the subcontractor's mass excavation of townhouse lots; there was no contract between the general contractor and the subcontractor; the general contractor merely told the subcontractor which lots to excavate and for what purpose; the general contractor did not direct the operative details of the subcontractor's or the plaintiff's work; the subcontractor used only its own equipment; the subcontractor's employees directed the plaintiff in how to perform his duties; and owners and employees of the subcontractor testified that the subcontractor was responsible for the means and methods used to perform their work).

¶ 91    Finally, we note that the fact that Buelow spoke to Campton personnel about setting up OSHA trench safety training *after* the collapse does not aid us in assessing the nature of the companies' relationship leading up to the accident, nor does it affect our conclusions.

¶ 92    In summary, the trial court did not err in granting Abbey summary judgment on the negligence counts.

¶ 93                                B. Notice

¶ 94    Next, relying on the premises liability doctrine, plaintiff argues that Abbey owed him a duty of care under section 343 of the Restatement because Abbey possessed the land where plaintiff sustained his injuries. He contends that the blueprints gave Abbey actual notice that the trench was over five feet deep and that it was, therefore, unsafe without shelving/shoring or a trench box. Plaintiff also maintains that Abbey was negligent because it knew of the dangerous

condition that caused plaintiff's injury, was able to safeguard against that condition, and failed to act with reasonable care.

¶ 95     "[T]he general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability." *Cochran*, 358 Ill. App. 3d at 879-80. Section 343 of the Restatement provides:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> >
> > (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> >
> > (c) fails to exercise reasonable care to protect them against the danger."
>
> Restatement (Second) of Torts § 343 (1965).

¶ 96     The trial court found that Abbey did not have actual or constructive notice that the trench in which plaintiff was working presented an unsafe condition. Campton maintained responsibility for the trench work, the court noted, not Abbey. Further, Abbey did not have notice of the trench's potentially unsafe condition sufficient to impose liability. The trench, the court found, was excavated by Campton on the date of the accident "just shortly (perhaps one hour) before" plaintiff sustained his injuries. "No one from Abbey was on site at any point that day." Thus, no Abbey representative had the opportunity to see the trench prior to its collapse. Buelow, the court noted, testified that he was on-site for about four minutes before the collapse and never saw the trench or had the opportunity to observe it prior to its collapse. Further, no one consulted with Abbey

concerning the use of a trench box or shoring/shelving. Peterson, Campton's vice president, the court noted, testified that Abbey would not have been involved with securing or shoring up the trench.

¶ 97    As to actual notice, plaintiff argues that the court erred in its determination because Abbey had plans/blueprints (showing the trench would start off at 2.95 feet and end at 5.1 feet) providing it notice and because Buelow was on the scene and around the trench for four minutes before the collapse. He even drove by the unsafe work, plaintiff notes, about two minutes before arriving near the scene on foot. Abbey provided Campton with all the information that Campton needed to dig the trench to its depth, Abbey could not commence work until Campton completed its phase of the work, the entities communicated daily about where Campton needed to be on the project, Buelow knew a trench was being excavated, and he was on the scene before the collapse. Thus, plaintiff argues, drawing all reasonable inferences in his favor, the dangerous condition of the unsecured trench encompasses the depth of the trench, which the blueprints imputed to Abby for bidding on the job. While plaintiff concedes that the trench depth is not the only factor to be considered in deciding whether to use shoring, he asserts that the blueprints determine the depth and whether shoring is needed on a particular site. Based on the blueprints, he argues, factual questions exist as to whether Abbey knew that the trench was deep enough to require shoring or a trench box.

¶ 98    We conclude that no material factual questions existed to preclude summary judgment in Abbey's favor on the actual notice issue. The deposition testimony was consistent that trench depth was not the only factor that determined whether shoring or a trench box was required. Plaintiff, Peterson, and Bowgren testified that soil condition is also a factor and that soil conditions were assessed by Campton personnel only after digging had begun. Further, Peterson elaborated that the decision as to whether to use a trench box or shoring depends on soil conditions, space, and

size of equipment. Also, Hansen testified that the trench in which plaintiff worked was not shelved out because there was an unmarked gas line on the side. Even if Abbey knew from the blueprints or otherwise that the trench depth would be over five feet, there is no evidence that Abbey knew that the trench was unsupported or unsecured or that shoring was required by law or contract. Further, Abbey played no role in digging out the trench, nor did it provide the relevant equipment.

¶ 99    Alternatively, plaintiff next argues that questions of fact exist as to whether Abbey had constructive notice that the trench constituted a dangerous condition. He contends that Buelow was onsite the day of the collapse, knew that the trench was being dug, and testified that he had the ability to inspect Campton's work at any time and that he could inspect its work during the storm sewer replacement. Plaintiff also notes that Buelow testified that, had he walked through the trench, he *could* have seen that unsafe trenchwork was being performed. He also contends that it is disputed whether the necessary equipment was on-site to support the wall. Thus, plaintiff reasons, based on the foregoing, a factual question exists as to whether the unsafe trench depth could have been discovered by a reasonable inspection of the trench and further whether Abbey had constructive notice of the unsafe trenching.

¶ 100   Plaintiff also argues that there is a factual question as to whether the unsafe trench depth persisted long enough that Abbey should have discovered it through the exercise of reasonable care. He maintains that there was some evidence that building the trench could take several days and that there was some evidence that Campton began digging the trench either on the morning of the day in question or the day before. He also points to Buelow's testimony that other than Buelow directing his attention to the design meeting, there was nothing precluding him from observing the work that was happening in the trench. Surveillance footage, plaintiff notes, shows that the trench wall stood about 11 minutes and 30 seconds before the collapse and that Buelow arrived on-site

about 2 minutes and 15 seconds before the collapse. (He first drove by four minutes before the collapse.) Thus, plaintiff reasons, there is a factual question as to whether the unsafe trench depth persisted one day, a matter of hours, or mere minutes before the collapse.

¶ 101 In response, Abbey contends that plaintiff misrepresents some of the evidence. Specifically, Abbey asserts that (1) there is no dispute as to whether the necessary equipment was on-site to support the trench wall and (2) the evidence shows that a trench box is not the only way to support a trench. Abbey also notes that there was no evidence that the trench was dug several days before the accident; in fact, it existed only a short time before the accident.

¶ 102 "When a general contractor has an insufficient opportunity to observe unsafe working conditions, then knowledge will not be inferred and direct liability will not ensue." *Calderon*, 381 Ill. App. 3d at 347. "[W]hether knowledge may be inferred depends upon a general contractor's opportunity to observe the plaintiff engage in dangerous activities, and *** the number of times a plaintiff confronts a dangerous condition is relevant to this analysis." *Id.* at 348.

¶ 103 We conclude that there is no material factual question precluding summary judgment for Abbey on the constructive notice issue. We disagree with plaintiff that there is a question as to how long the unsafe trench depth persisted at the site. Plaintiff contends that Buelow testified that the trench was dug either the morning of the collapse or the day before. Actually, his testimony was that he did not recall when it was dug. The other evidence, including Huerta's testimony, was consistent that the trench was dug that day. Other than Buelow, no Abbey personnel were on the jobsite on the day of plaintiff's accident. Buelow was at the site for a meeting to discuss an issue unrelated to Campton's work. Buelow testified that he did not see the trench until after the accident. He was not near it, nor was it within his field of view. He arrived at the site about four minutes before the trench collapse, which occurred about two minutes after he arrived at the meeting. His

presence at the site for such a brief period was not sufficient to create a material factual question concerning Abbey's constructive notice of the dangerous condition. See *Cochran*, 358 Ill. App. 3d at 880 (affirming summary judgment for the general contractor; the plaintiff admitted an unsafe ladder setup put in place by his employer's foreman existed for about one hour at most before his injury, the injury occurred in a relatively remote location, and none of the general contractor's competent persons had observed the unsafe setup during that short period). Further, Peterson estimated that the entire process, including the final pipe replacement and backfilling of the trench, would take no longer than one hour, and Campton had not even completed the pipe replacement when the trench collapsed. Thus, the time between digging out the trench and its collapse was significantly shorter than one hour.

¶ 104   In summary, the trial court did not err in granting Abbey summary judgment on the premises liability count.

¶ 105                                  III. CONCLUSION

¶ 106   For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 107   Affirmed.

*Neisendorf v. Abbey Paving & Sealcoating Co.*, **2024 IL App (2d) 230209**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-L-412; the Hon. Robert K. Villa, Judge, presiding. |
| **Attorneys for Appellant:** | C. Nicholas Cronauer and Jessica Parsons, of Cronauer Law LLP, of Sycamore, for appellant. |
| **Attorneys for Appellee:** | Christopher G. Buenik and Meredith Fileff, of Franco Moroney Buenik, LLC, of Chicago, for appellee. |